**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2597

_____

MICHAEL J. PALARDY, JR.,

Appellant

v.

TOWNSHIP OF MILLBURN;
TIMOTHY P. GORDON

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. No. 2:15-cv-02089)
District Judge: Hon. Susan D. Wigenton

_____

Argued April 24, 2018

Before: AMBRO, SCIRICA, and SILER, JR.[*], *Circuit Judges*

_____

[*] Hon. Eugene E. Siler, Jr., United States Court of Appeals for the Sixth Circuit, sitting by designation.

(Filed: September 19, 2018)

Dennis A. Durkin, Esquire  (Argued)
Law Offices of Dennis A. Durkin
P.O. Box 88
Roseland, NJ 07068

  Counsel for Appellant

Littie E. Rau, Esquire  (Argued)
Ruderman Horn & Esmerado
675 Morris Avenue, Suite 100
Springfield, NJ 07081

  Counsel for Appellees

_____

OPINION OF THE COURT
_____

**SILER**, *Circuit Judge*

  Michael Palardy, a retired police officer of Township of Millburn, New Jersey, alleges that the Township's business administrator, Timothy Gordon, unlawfully prevented him from becoming Chief of Police because Gordon opposed Palardy's union membership and activity.  The district court held Palardy's union-related speech and association were not constitutionally protected and granted summary judgment in favor of the Township and Gordon on his 42 U.S.C. § 1983 First Amendment retaliation claims.  We agree with Palardy that the district court should have analyzed his speech and association claims separately and that his association with the

union deserves constitutional protection. However, Palardy's speech claim must fail because it is indistinguishable from his associational claim. Therefore, we affirm in part, reverse in part, and remand for further proceedings.

I.

Palardy worked as a police officer for the Township from 1988 until his retirement in 2014. During his employment, he was promoted three times: first to sergeant in 1995, then to lieutenant in 1998, and finally to captain in 2012.

Palardy was also active in the police officers' unions—first the Patrolmen's Benevolent Association (PBA), and then the Superior Officers' Association (SOA). In 1991 or 1992, Palardy served as the PBA's sergeant-at-arms. He was also a union delegate from 1992 to 1995. Later in his career, Palardy became more involved in union leadership. He served as the SOA's vice president in 2007 or 2008, and as its president in 2009 or 2010. During his employment, Palardy estimates that he participated in four or five contract negotiations between the unions and the Township. He also attended at least two disciplinary hearings for fellow officers.

Gordon was the Township's business administrator during Palardy's entire employment. Among other duties, he was responsible for the Township's personnel matters and had the authority to hire, fire, and promote Township employees, including police officers. According to Palardy, Gordon repeatedly stymied Palardy's attempts to become Chief of Police. Palardy testified that other officers told him Gordon repeatedly made statements reflecting negatively on Palardy's union activity. For instance, Gordon told officer Robert Brown that Palardy would never become chief "because of his union affiliation and being a thorn in my side

3

for all these years." Gino Baldani said that Gordon told him Palardy "wasn't a good supervisor . . . because [he] was too close to [his] men and [he] would have problems separating [his] union business with police department work and being a supervisor." And Gordon told former chief Paul Boegershausen that Palardy "ha[d] to learn how to separate [him]self from the rank and file."

The events relevant to this case began in late 2010, when the Township was without a chief or a team of captains. By then, Palardy was the department's most senior lieutenant and was next in line to become a captain. The Township's custom during this time was to select its new chief from its roster of captains; during Gordon's tenure, there had never been an exception to this rule. Because Palardy was a lieutenant, he was not eligible to immediately become chief. However, Palardy believed that he could have been promoted to captain for a short time and then promoted to chief. According to Palardy, this is precisely what happened shortly after his retirement: Palardy testified that, as of September 2016, the acting chief had only been a captain for a few months prior to his promotion.

On this occasion, though, Gordon told Palardy and another lieutenant that he did not believe any of the lieutenants had enough experience to become chief, and that he was considering having the Chief of Police from nearby Livingston, New Jersey, serve in a dual capacity as the chief of both towns. That plan did not come to fruition because Gregory Weber, a Millburn captain who had been on inactive duty for health reasons, returned to active duty and was promoted to chief in September 2011. Weber then gave Palardy the title of "acting captain," which came with additional responsibilities but no pay increase. Around this time, Palardy stepped down as union president because he "knew Mr. Gordon had a problem with [his] union affiliation"

4

and he wanted "to get the stigma off . . . [himself] that [he] was only a union guy." Palardy believed that, if he gave up his union presidency, it would increase his chances to receive an official promotion to captain.

In October 2011, Gordon retained a consultant to study the police department's "rank structure and current vacancies." Gordon admitted that the study "could have" resulted in the rank of captain being eliminated. However, the consultant recommended that the department retain the captain rank and fill the existing vacancies in that position. To that end, Gordon promoted Palardy to captain in February 2012—according to Palardy, "out of desperation."

Chief Weber was scheduled to retire in April 2015. In the summer of 2013, Palardy was offered a part-time position as Security Coordinator for the Township's Board of Education. He says he "saw the writing on the wall that he would never become chief," so he decided to retire from the police department and accept the school board's job offer. Beginning on September 1, 2013, Palardy was on terminal leave, and he retired effective February 1, 2014.

Palardy then filed suit against the Township and Gordon. His amended complaint asserted eight claims. The district court granted Defendants' motion for judgment on the pleadings as to five of the eight counts, but allowed his state and federal constitutional free speech and association claims to proceed to discovery. Defendants then moved for summary judgment on Palardy's remaining claims.

The court granted Defendants' motion, holding Palardy's union-related activity was not constitutionally protected. Analyzing his speech and association claims together, the court concluded Palardy neither acted as a private citizen nor spoke out on a matter of public concern, as

required by *Garcetti v. Ceballos*, 547 U.S. 410 (2006). This appeal followed.

## II.

This Court "exercise[s] plenary review over a grant of summary judgment and appl[ies] the same standard the district court applies." *Migliaro v. Fid. Nat'l Indem. Ins. Co.*, 880 F.3d 660, 664 n.6 (3d Cir. 2018) (citation omitted). "Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(a)).

The Free Speech Clause contained within the New Jersey Constitution "is generally interpreted as co-extensive with the First Amendment," so the analysis of Palardy's state free speech claim is identical to its federal counterpart. *Twp. of Pennsawaken v. Schad*, 733 A.2d 1159, 1169 (N.J. 1999).

## III.

### A.

To prevail on a § 1983 First Amendment retaliation claim, the plaintiff must prove that (1) he engaged in "constitutionally protected conduct," (2) the defendant engaged in "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights," and (3) "a causal link [existed] between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citation omitted). Here, the District Court held that Palardy's First Amendment claims faltered at the first step because he failed to show that his association with, and speech on behalf of, the police officers' union was protected conduct.

Not all First Amendment activity is constitutionally protected in the public workplace. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti*, 547 U.S. at 418 (citation omitted). Insofar as workplace speech is concerned, the Supreme Court has long held that public employees only receive First Amendment protection from retaliation in the workplace when they speak out on a matter of public concern and their interest in speaking outweighs the government's interest in promoting workplace efficiency and avoiding disruption. *See Connick v. Myers*, 461 U.S. 138, 147 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). In *Garcetti*, the Court added a further wrinkle to its workplace speech jurisprudence, holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Following *Garcetti*, then, "[a] public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public.'" *Hill v. Borough of Kutztown*, 455 F.3d 255, 241-42 (3d Cir. 2006) (quoting *Garcetti*, 547 U.S. at 418).

Although *Pickering*, *Connick*, and *Garcetti* were cases about speech, some circuits apply the same rubric to cases involving the associational rights of public employees. This is especially true when an employee's freedom of association claim "implicate[s] associational rights in essentially the same way and to the same degree" as his free speech claim. *Sanguigni v. Pittsburg Bd. of Pub. Educ.*, 968 F.2d 393, 400 (3d Cir. 1992) ("We hold . . . that *Connick* governs [the plaintiff's] freedom of association claim because that claim is

7

based on speech that does not implicate associational rights to any significantly greater degree than the employee speech at issue in *Connick*.").

Palardy's case, however, is different. He claims, in part, that Gordon retaliated against him simply because of his union membership, and not because of his advocacy on any particular issue. Indeed, the comments he alleges Gordon made to other officers—for instance, Palardy was disqualified from becoming chief "because of his union affiliation"—evince hostility toward Palardy solely because of his union membership. Palardy's complaint presents a pure associational claim, so the district court should have analyzed Palardy's speech and association claims separately.

## B.

Taking Palardy's freedom of association claim, we must first determine whether Palardy engaged in protected conduct. This question, in turn, depends upon whether *Connick* and *Garcetti* apply to pure associational claims like Palardy's.

The circuits are split on whether *Connick*'s public-concern requirement applies to associational claims, and we have not yet taken a position. *See Sanguigni*, 968 F.2d at 400. The Second, Fourth, Sixth, and Seventh Circuits apply the public concern requirement to public employee association claims. *See Cobb v. Pozzi*, 363 F.3d 89, 107 (2d Cir. 2004); *Edwards v. City of Goldsboro*, 178 F.3d 231, 249-50 (4th Cir. 1999); *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir. 1985); *Klug v. Chi. Sch. Reform Bd. of Trs.*, 197 F.3d 853, 857 (7th Cir. 1999). The reasoning of courts adopting this position is exemplified by the Second Circuit's decision in *Cobb*. There, the court wrote that, although in *Connick* "it was the plaintiff's *speech* that was under examination, the

8

Court's concern over the proper balance of the efficient functioning of the government and the First Amendment rights of public employees extended more generally to all forms of First Amendment *expression*, including associational activity." *Cobb*, 363 F.3d at 104. "Because the right of association is derivative of the First Amendment rights of free speech and peaceful assembly," the Second Circuit reasoned, "it would be anomalous to exempt it from *Connick*'s public concern requirement and thereby accord it an elevated status among First Amendment freedoms." *Id.* at 105. The Sixth Circuit in *Boals* also noted that although *Connick* and *Pickering* were speech cases, they were in turn based upon freedom of association cases. *Boals*, 775 F.2d at 692.

On the other side of the split, the Fifth and Eleventh Circuits hold the public concern requirement does not apply to associational claims. *See Boddie v. City of Columbus*, 989 F.2d 745, 749 (5th Cir. 1993); *Hatcher v. Bd. of Pub. Educ. & Orphanage*, 809 F.2d 1546, 1558 (11th Cir. 1987). The Fifth Circuit suggests that no additional proof of public concern is necessary because the union activity of public employees "is not solely personal and is *inevitably* of public concern." *Boddie*, 989 F.2d at 750 (emphasis added). And the Eleventh Circuit in *Hatcher* fell back upon the Supreme Court's decision in *NAACP v. Alabama*, "in which Justice Harlan wrote for the Court: 'it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters . . . [,] state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.'" *Hatcher*, 809 F.2d at 1558 (quoting *NAACP v. Alabama*, 357 U.S 449, 460-61 (1958)). *Connick*, according to the Eleventh Circuit, did not mark a retreat from that position. *Id.*

The Ninth and Tenth Circuits both take unique approaches. The Ninth Circuit applies the public concern

requirement to "hybrid" free speech and association claims, but it has not decided the question for freestanding association claims. *See Hudson v. Craven*, 403 F.3d 691, 698 (9th Cir. 2005). The Tenth Circuit generally requires the public concern requirement for freedom of association claims, *see Merrifield v. Bd. of Cty. Comm'rs*, 654 F.3d 1073, 1083-84 (10th Cir. 2011), but has rejected the requirement in "the specific context of public-employee labor unions," *id.* at 1084 (citing *Shrum v. City of Coweta*, 449 F.3d 1132, 1138 (10th Cir. 2006)).

In this specific context—an associational claim arising from a public employee's union affiliation—the minority position followed by the Fifth Circuit is the better one. Even courts in the majority recognize that at least some union speech and activity touch upon matters of public concern. *See, e.g.*, *Boals*, 775 F.2d at 693. It follows, then, that a public employee's membership in a union might also be a matter of public concern. But how are courts to distinguish between union membership that implicates a public concern, and union membership that does not?

Where speech is concerned, the test is easy: "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest . . . are matters more immediately concerned with the self-interest of the speaker as employee." *Id.* (quoting *Campbell v. Galloway*, 483 F.3d 258, 267 (4th Cir. 2007)). But union-related speech is different than mere union membership. Because labor unions advocate for their employees on a wide range of issues, the number of possible subjects for union-related speech is similarly wide-ranging. Conversely, union membership is a dichotomy—either an employee is a union member, or he is not. As Seventh Circuit Judge Cudahy recognized, the test used to determine whether speech

10

implicates a matter of public concern does not square with this dichotomy:

> [T]he *Pickering/Connick* test is cumbersome in the context of a pure association claim. Under *Connick*, whether an employee's speech touches on a matter of public concern is determined by an analysis of the "content, form, and context of a given statement." *Connick v. Myers*, 461 U.S. 138, 147-48, (1983). This analysis is applied easily to the hybrid cases cited by the majority. In *Griffin v. Thomas*, for instance, an assistant principal alleged that her employer retaliated against her for filing a grievance through the Chicago Teachers Union. *See* 929 F.2d 1210, 1210 (7th Cir. 1991). To determine whether the plaintiff's activity touched on a public concern, the court was able to review the substance of her grievance. *See id.* at 1215. But how does one neatly apply the "content, form, and context" analysis to a [pure associational] claim . . . ?

*Balton v. City of Milwaukee*, 133 F.3d 1036, 1041 (7th Cir. 1998) (Cudahy, J., concurring).

Here, the Township does not provide any justiciable basis for us to separate the wheat from the chaff—to determine which union association is worthy of First Amendment protection and which is not. By holding that mere membership in a public union is always a matter of public concern, the Fifth Circuit's approach avoids this problem. *See Boddie*, 989 F.2d at 750. *Connick*'s public-concern requirement thus stands as no obstacle to Palardy's associational claim.

11

There is less authority regarding whether *Garcetti*'s private-citizen requirement applies to pure associational claims. The Second Circuit has stated that the issue is unclear. *Lynch v. Ackley*, 811 F.3d 569, 583 n.15 (2d Cir. 2016).

As with *Connick*'s public-concern requirement, it does not make much sense to apply *Garcetti*'s private-citizen requirement to pure associational claims based on union membership. The touchstone of *Garcetti* is whether the public employee was "mak[ing] statements pursuant to [his] official duties." *Garcetti*, 547 U.S. at 421. By the plain language of the Court's opinion, then, *Garcetti* applies to speech, not association.

Moreover, it is hard to imagine a situation where a public employee's membership in a union would be one of his "official duties." *Garcetti*, 547 U.S. at 421. This is especially true in light of *Janus v. American Federation of State, County, and Municipal Employees*, 138 S. Ct. 2448, 2460 (2018), where the Supreme Court recently held that public employees who choose not to join their union cannot be compelled to pay agency fees to offset the costs of the union's collective bargaining efforts.

Labor unions, by their very nature, exist to protect the interests of the employees on whose behalf they bargain; job duties derive from the needs of the employer. And in this specific case, there is no evidence that Palardy's membership in the police officers' union was one of his job duties. To the contrary, he alleges he resigned his union presidency because he thought it would help further his career. For these reasons, we decline to apply *Garcetti*'s private-citizen test to Palardy's freedom of association claim.

12

Having established that *Connick* and *Garcetti* do not bar Palardy's associational claim, it becomes clear that his union membership is worthy of constitutional protection. Prior to those cases, the Supreme Court noted that a public employee possesses a First Amendment right to associate with a union. *See Smith v. Ark. State Highway Emp.*, 441 U.S. 463, 465 (1979). Palardy was a union member and leader, and he brought forth at least some evidence suggesting Gordon harbored animosity toward him because of his union affiliation. The district court therefore erred by holding as a matter of law that Palardy did not establish the first element of his First Amendment retaliation claim—constitutionally-protected conduct.

Because it found Palardy could not prevail on the first element, the court did not consider whether he created a genuine issue of material fact on the other two elements of his associational claim—whether Defendants engaged in "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights," and whether "a causal link [existed] between the constitutionally protected conduct and the retaliatory action." *Thomas*, 463 F.3d at 296 (citation omitted). Defendants do not address these elements on appeal, and we do not believe the evidence is so one-sided as to require summary judgment in their favor. Thus, we remand to the district court to consider the remaining two elements of Palardy's associational claim.

## C.

Compared to his associational claim, the analysis of Palardy's speech claim is much more straightforward. As noted earlier, we have dismissed associational claims that we viewed as co-extensive with the plaintiff's free speech claim. *See Sanguigni*, 968 F.2d at 400. Here, the opposite is true— Palardy's free speech claim is co-extensive with his

13

associational claim.  He does not allege that Gordon retaliated against him because of his speech or advocacy on any particular issue.  He simply claims that Gordon prevented him from becoming chief because he was a union man.  Because Palardy did not adequately plead a freestanding speech claim, Defendants are entitled to summary judgment on that claim.

## IV.

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

14