**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1344
_____

MIKE BALOGA,
                    Appellant

v.

PITTSTON AREA SCHOOL DISTRICT;
JIM SERINO
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(M.D. Pa. No. 3-16-cv-01039)
Honorable Richard P. Conaboy, U.S. District Judge
_____

Argued: October 23, 2018

Before: KRAUSE, COWEN, and FUENTES, *Circuit Judges*

(Opinion Filed: June 25, 2019)

Cynthia L. Pollick   [ARGUED]
The Employment Law Firm
363 Laurel Street
Pittston, PA 18640

      *Counsel for Plaintiff-Appellant Mike Baloga*

William J. McPartland
Thomas A. Specht   [ARGUED]
Marshall Dennehey Warner Coleman & Goggin
P.O. Box 3118
Scranton, PA 18505

      *Counsel for Defendants-Appellees Pittston Area*
      *School District and Jim Serino*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

Mike Baloga, a custodian for the Pittston Area School District and vice president of the custodial union, alleges that the District and its maintenance director, Jim Serino, violated his First Amendment rights by retaliating against him based on his union association and related speech. Treating Baloga's speech and association claims together, the District Court granted summary judgment in favor of the District and Serino, concluding that Baloga's activity was not constitutionally protected because it did not implicate a matter of public concern. As we recently emphasized in *Palardy v. Township*

*of Millburn*, however, where a public employee asserts retaliation in violation of the First Amendment as a free speech claim and a pure union association claim, those claims must be analyzed separately, and consistent with longstanding Supreme Court precedent, there is no need to make a separate showing of public concern for a pure union association claim because membership in a public union is "always a matter of public concern." 906 F.3d 76, 80–81, 83 (3d Cir. 2018), *cert. denied*, No. 18-830, — S. Ct. —, 2019 WL 2078114, at *1 (May 13, 2019). Because Baloga has raised a triable issue about whether he was retaliated against based solely on his union association, we will affirm in part, reverse in part, and remand for further proceedings.

## I. Background

### A. Factual Background[1]

Baloga became a full-time custodian for the District in 1999. Between 2008 and 2016, he worked most of the year at the primary center,[2] where his duties related to field

---

[1] The facts set forth here are drawn from the parties' statements of undisputed facts, deposition testimony, and exhibits. Because we are reviewing a district court's grant of summary judgment, we recite the facts in the light most favorable to Baloga as the non-moving party and make all reasonable inferences in his favor. *See Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 266–67 (3d Cir. 2005).

[2] The record refers interchangeably to the location where Baloga spent most of his time as both the "primary

maintenance and outdoor work. Given the seasonal nature of that work, however, the District would transfer Baloga to the high school each year from December through late February or March of the following year, with the specific rotation dates depending on the District's needs.[3]

In addition to these job responsibilities, Baloga began serving as the vice president of the custodial union in 2010. In this role, he was regularly approached by fellow custodians about problems they were having with the District, and Baloga made efforts to solve them internally, often acting as the union's "mouthpiece" in relaying concerns to the District. JA 63. However, the decision whether to escalate an issue to an official grievance was decided by Thomas Rome, the union president, in consultation with Baloga.

According to Baloga and Rome, the relationship between the union and the District—and, in particular, its maintenance director, Jim Serino—was strained. Over the years, Baloga testified, Serino repeatedly threatened that the school board would eliminate union members' days off if the union continued to file grievances. And according to Rome, "[t]here was never a good atmosphere" between the union and Serino, and it appeared that Serino did not "ha[ve] respect for the bargaining unit." JA 64. Rome also testified that he

---

center" and the "primary school." For consistency, we will refer to the location as the "primary center."

[3] Although the Collective Bargaining Agreement prohibited transfers between the two schools, Baloga's transfers were permitted as a past practice.

4

thought Serino "wanted [Baloga] out of the mix" because Baloga, "being [at the high school] . . . , being pro union, [and] being pro contract," might "interfere" with Serino's directives. JA 64. School board members and others employed by the District likewise perceived Serino to have a negative attitude toward the union.

In the 2015–2016 school year, Baloga rotated from the primary center to the high school in early January, a little later than usual. Within a couple of weeks, Baloga learned that the District intended to require custodians to work on Martin Luther King Jr. Day even though they had received that day as a holiday for the past twenty-six years. Teachers and students continued to have the day off. On January 15, 2016, after consulting with Baloga, Rome filed a grievance on behalf of the union, challenging the District's decision as a violation of a past practice. The same day, Baloga sent a text message to Serino, and the following exchange ensued:

| | |
|---|---|
| Baloga: | I have plans on Monday. Why are they making us work. We never worked a [Martin Luther King Jr.] day ever. In my 26 years. Do I have to take a day off? |
| Serino: | Unfortunately there is [sic] multiple events and lots of work that needs to be completed. A day will have to be used if you are not present. |
| Baloga: | You can't do anything as boss. You['re] the director. |

5

|  | You have a lot of influence. Why can't you talk to [superintendent] Kevin [Booth]. |
| Serino: | Already did. |
| Baloga: | In the past [former maintenance director] Clarence always got us the day off. It really hurts us with families. |

JA 25. Shortly after the union filed the grievance, Baloga also exchanged words with his direct supervisor, Ken Bangs, who told him that "because you filed a grievance on Martin Luther . . . King Day, the board now says you have to work full days on snow days." JA 212.

On the following Friday, January 22, 2016, Baloga and Serino spoke in person about the grievance. According to Baloga, Serino was "very, very angry," accused him of "complaining," and said that if Baloga was "not happy [at the high school]," Serino "could transfer [him] today."[4] JA 215. Baloga demurred, telling Serino that he was happy in his position but that "people are coming to me as the vice president [of the union] wondering why they're getting a day taken off

---

[4] Although Serino testified that he told Baloga during their conversation that Baloga was bringing down morale, Baloga disputes this and contends that Serino was upset because he thought Baloga was telling others that morale in the District was low.

them," JA 40, to which Serino responded: "You should have never filed that grievance until you talked to me," JA 36.

Later that day, less than three weeks into Baloga's rotation, Bangs notified him that he was being transferred back to the primary center, effective the next business day—that is, more than a month before his usual transfer date. Serino did not explain the transfer decision to Baloga, but he asserted in subsequent deposition testimony that there were two reasons: (1) Baloga's colleagues said he was "bringing the morale" of the group down by "whining," JA 102; and (2) the District had hired new employees, so Baloga's continued assistance at the high school was no longer necessary. Notwithstanding the District's prior practice of annual rotations, Baloga has not been assigned to work at the high school again since the transfer.

Although the early (and, effectively, permanent) transfer did not change his pay or benefits, Baloga testified that it negatively affected him in other ways. For example, he could no longer go home during lunchtime to help his wife, who homeschools their eight children, because the primary center is twice as far as the high school from his home. He also could no longer work the 6:00 a.m. to 2:00 p.m. shift—a benefit only available to workers at the high school—which had allowed him to go home early at least once a month. Finally, he described the transfer as effectively a demotion in job responsibilities, with attendant reputational and emotional costs, as his tasks at the primary center during the winter months were menial relative to those at the high school, reducing him to "a mop and a broom." JA 38. Fearful of further retribution, however, Baloga did not file a grievance to contest his transfer.

7

## B.    Procedural Background

Baloga eventually filed the underlying complaint in this action, asserting two First Amendment retaliation claims against the District and Serino (the "Defendants")—one for a violation of his freedom of speech and one for a violation of his right to associate with the union.  The parties then filed cross-motions for summary judgment, with the Defendants arguing that Baloga's activity was not constitutionally protected, but that, even if it were, he failed to establish the other elements of a retaliation claim.  Defendants further argued that there was no municipal policy or custom as required to support liability against the District under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978), and that Serino was entitled to qualified immunity because any constitutional right at issue was not "clearly established" at the relevant time.

The District Court denied Baloga's motion and—reaching only the question whether Baloga's activity was constitutionally protected—granted the Defendants'.[5]

---

[5] As for Baloga's motion, the Court explained that summary judgment was inappropriate because the motivation for Baloga's transfer was "far from clear."  JA 8.  Although the Court acknowledged that "the temporal proximity" between the union's filing of the Martin Luther King Jr. Day grievance and Baloga's transfer was "somewhat suggestive of a retaliatory motive," it concluded that many other factors, such as the transitory nature of Baloga's transfers and the fact that the District had recently hired new employees to work in the high school, could lead a reasonable jury to conclude that the

Although the Defendants sought summary judgment on both Baloga's speech and association claims, the District Court explicitly discussed only Baloga's speech, concluding that it was not constitutionally protected because it did not address a matter of public concern under *Connick v. Myers*, 461 U.S. 138 (1983). Rather, the Court reasoned, his speech implicated only "his personal preference to have a paid holiday" and, at most, a concern for employee morale. JA 12. Even if Baloga's speech did touch on a matter of public concern, the Court continued, Baloga's "interest in speaking out" was subordinate to the interest of the District in assigning its personnel in a manner that "promotes harmony in the workplace and efficient performance of its mission." JA 15. Without separately analyzing Baloga's association claim, the District Court then granted summary judgment to the Defendants on both counts of the complaint. This appeal followed.

## II. Jurisdiction and Applicable Standards

The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's grant or denial of summary judgment de novo, *see EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 448 (3d Cir. 2015), and may affirm on any basis supported by the record, *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009). Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a

---

District's decision to transfer Baloga was not retaliatory. JA 8–9.

verdict for the nonmoving party," *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), and a fact is "material" where "its existence or nonexistence might impact the outcome of the suit under the applicable substantive law," *id.* (citing *Anderson*, 477 U.S. at 248).  At the summary judgment stage, our role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," *Anderson*, 477 U.S. at 249, and like the District Court, we must review the facts in the light most favorable to the non-moving party, *see Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

### III.  Discussion

To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983,[6] a plaintiff must prove that "(1) he engaged in 'constitutionally protected conduct,' (2) the defendant engaged in 'retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights,' and (3) 'a causal link [existed] between the constitutionally protected conduct and the retaliatory action.'"[7]

---

[6] To establish any claim under § 1983, a plaintiff must demonstrate that (1) the conduct at issue was committed by a person acting under the color of state law, and (2) the complained-of conduct deprived the plaintiff of rights secured under the Constitution or federal law.  *See Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).  Only the second criterion is at issue here.

[7] The first element of the analysis requires a legal determination; the remaining steps present questions for the

10

*Palardy*, 906 F.3d at 80–81 (quoting *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)).  If a plaintiff satisfies these elements, the government may avoid liability if it can show by a preponderance of the evidence that it would have taken the adverse action "even in the absence of the protected conduct." *Miller v. Clinton Cty.*, 544 F.3d 542, 548 (3d Cir. 2008) (quoting *Watters v. City of Phila.*, 55 F.3d 886, 892 (3d Cir. 1995)).

Here, we address only Baloga's association claim because he failed to press his speech claim on appeal.[8]  The

fact finder.  *See Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001); *see also Watters v. City of Phila.*, 55 F.3d 886, 899 (3d Cir. 1995) ("[W]hen considering the protected status of [First Amendment activity], an appellate court must . . . make an independent constitutional judgment on the facts of the case." (citations omitted)); *Suppan v. Dadonna*, 203 F.3d 228, 233–35 (3d Cir. 2000) ("It is a question of fact whether the [allegedly adverse action] reached the threshold of actionability under section 1983." (citation omitted)); *Zamboni v. Stamler*, 847 F.2d 73, 79–80, 79 n.6, 80 (3d Cir. 1988) (noting that whether protected activity was a motivating factor for an employer's adverse action and whether the employer would have taken the action regardless are questions for the jury).

[8] In his briefing on appeal, Baloga refers almost exclusively to the associational rights at stake and at oral argument, Baloga's counsel confirmed that the crux of her client's argument was that he was retaliated against for his association with the union, not for his speech.  As Baloga has not meaningfully briefed or argued his speech claim on appeal,

District Court disposed of the association claim (like the speech claim) on the first element, treating Baloga's speech and association as coextensive and concluding that Baloga did not engage in constitutionally protected activity because his speech did not involve a matter of public concern. As a result, it had no need to reach the other arguments raised by the Defendants. Defendants urge us to affirm on any of those bases, namely (A) that Baloga's activity was not constitutionally protected; (B) that even if it were, Baloga has not raised a triable issue on the remaining elements of his retaliation claim; (C) that the record does not support liability against the District under *Monell*; or (D) that Serino is entitled to qualified immunity. We consider these arguments in turn, beginning with the focus of the parties' briefing, whether Baloga's conduct was constitutionally protected.

## A.      Element One: Constitutionally Protected Conduct

Public employees do not surrender their First Amendment rights merely because they work for the government. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *Baldassare*, 250 F.3d at 194. Nevertheless, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti*, 547 U.S.

---

he has waived it. *See In re: Asbestos Prods. Liab. Litig. (No. VI)*, 873 F.3d 232, 237 (3d Cir. 2017). But even if his passing references to the free speech claim he raised in the District Court, e.g., as a "back up" argument, Oral Arg. at 09:45–10:20, were sufficient to preserve it on appeal, we would agree, for substantially the same reasons identified by the District Court, that it does not survive summary judgment.

at 418. In the context of speech, the Supreme Court has demanded that we "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). We therefore undertake a three-prong inquiry: (1) whether the employee spoke as a citizen; (2) whether the statement involved a matter of public concern; and (3) whether the government employer nevertheless had "an adequate justification for treating the employee differently from any other member of the general public" based on its needs as an employer. *Palardy*, 906 F.3d at 81 (citation omitted).

As there is no dispute in this case that the first prong is satisfied,[9] we consider below the second and third, that is, the public concern requirement and the balance of interests.

### 1. The Public Concern Requirement

Until recently, our Court had spoken only briefly about whether the public concern requirement that applies to speech claims also applies to association claims, and we did so outside the union context. In *Sanguigni v. Pittsburgh Board of Public Education*, a public high school teacher alleged that she had

---

[9] Defendants do not contest the District Court's finding that Baloga spoke as a private citizen and not pursuant to his official duties as an employee. *See Garcetti*, 547 U.S. at 424; *Palardy*, 906 F.3d at 81. Thus, they have waived on appeal any arguments to the contrary.

been retaliated against for criticizing the school administration in a paragraph of a faculty newsletter. 968 F.2d 393, 395–96 (3d Cir. 1992). In addition to alleging a violation of her freedom of speech, the teacher claimed that her right to freedom of association had been violated because the statements in the newsletter were intended to garner faculty opposition to the school administration. *Id.* at 400. After acknowledging the split among Courts of Appeals on the question of whether the public concern element applied generally to freedom of association claims, we found it unnecessary to enter the fray because Sanguigni's particular association claim "implicate[d] associational rights in essentially the same way and to the same degree" as her free speech claim and thus was subject to the public concern requirement applicable to any speech claim.[10] *Id.* at 400; *see also Gorum*, 561 F.3d at 185 n.4 (explaining that application of the public concern requirement is appropriate where the "associational claim is linked closely enough with [the] free-speech claim").

---

[10] Specifically, we said that Sanguigni's association claim was subject to the public concern requirement because "that claim is based on speech that does not implicate associational rights to any significantly greater degree than the employee speech at issue in *Connick*." *Sanguigni*, 968 F.2d at 400. In *Connick*, an employee circulated a questionnaire to her colleagues in an apparent effort to solicit their support for her position with respect to the office's transfer policy, handling of grievances, and other matters. *See* 461 U.S. at 141. But neither *Sanguigni* nor *Connick* concerned union association.

14

In *Palardy*, however, we observed that in the context of a pure association claim based on union membership, i.e., based on status as a union affiliate and not any particular speech on behalf of the union, the public concern element is necessarily satisfied. 906 F.3d at 81–83. There, the plaintiff, the vice president and then president of his union, alleged that he was passed over for promotion in the police department because of his leadership role in the union and his union-related activities. *Id.* at 79–80. As here, the district court analyzed Palardy's speech and association together and concluded that Palardy's activity was not constitutionally protected because Palardy's speech did not involve a matter of public concern. *Id.* at 80.

We reversed. Where union-related speech forms the basis of an association claim, we explained, courts must assess whether the public concern prong is met on a case-by-case basis. *See id.* at 83. Indeed, because labor unions advocate for their members on a multitude of issues, "the number of possible subjects for union-related speech is similarly wide-ranging." *Id.* But where an association claim is premised on one's membership in a union—"a dichotomy" where one is either a member of a union or one is not—no "justiciable basis" exists to determine which union association merits First Amendment protection and which does not. *Id.* Thus, consistent with longstanding Supreme Court precedent "that a public employee possesses a First Amendment right to associate with a union," *id.* (citing *Smith v. Ark State Highway Emp.*, 441 U.S. 463, 465 (1979)), we recognized that "mere membership in a public union is always a matter of public concern," *id.* And because Palardy's association claim was premised on the notion that he was retaliated against based on his "involve[ment] in union leadership," i.e., "simply because

15

of his union membership, and not because of his advocacy on any particular issue," we concluded that the public concern requirement did not stand in the way of that claim. *Id.* at 79, 81.

Although we spoke in *Palardy* primarily about union "membership," our recognition of the public concern inherent in union membership applies with particular force to union leaders, for the right of union membership "would be meaningless unless an employee's right to participate in union activities were also recognized." *Roberts v. Van Buren Pub. Sch.*, 773 F.2d 949, 957 (8th Cir. 1985) (citation omitted). As we said long ago, "[p]lainly efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action." *Labov v. Lalley*, 809 F.2d 220, 222–23 (3d Cir. 1987); *see also Smith*, 441 U.S. at 464 ("The First Amendment . . . protects the right of associations to engage in advocacy on behalf of their members."). And because a union's ability to file grievances on behalf of its members is essential to its collective bargaining power, *see Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1439 (10th Cir. 1990), retaliation against a union leader for the union's decision to file a grievance—as distinct from retaliation based on the substance of the grievance—constitutes retaliation based on association rather than on speech per se, *see Columbus Educ. Ass'n v. Columbus City Sch. Dist.*, 623 F.2d 1155, 1159 (6th Cir. 1980) ("[R]etaliat[ion] against the zealous representation by a union spokesperson of a member's grievance impermissibly infringes upon the constitutional right of free association . . . ."); *see also Prof'l Ass'n of Coll. Educators (PACE), TSTA/NEA v. El Paso Cty. Cmty. Coll. Dist.*, 730 F.2d 258, 262 (5th Cir. 1984) ("[T]he First

16

Amendment [right of association] is violated by state action whose purpose is either to intimidate public employees from joining a union or from taking an active part in its affairs or to retaliate against those who do.").

Baloga has adduced sufficient evidence to persuade a reasonable jury that is what occurred here. In addition to the evidence of Serino's general animus toward the union and its leadership, Baloga testified that after he told Serino that union members were approaching him "as the [union] vice president" to complain about losing the holiday, JA 40, Serino responded angrily, "*you* should have never filed that grievance until you talked to me," JA 215 (emphasis added), and Ken Bangs said that because "*you* filed a grievance on Martin Luther . . . King Day . . . *you* have to work full days on snow days," JA 212 (emphasis added). But, of course, Baloga was not the person who actually filed the grievance for the union—union president Thomas Rome did. Thus, "you" in this context could only mean "you, as representative of the union." In other words, viewing the facts in the light most favorable to Baloga, Baloga was transferred because his union filed a grievance and—*based on his status as a union leader*—management attributed responsibility for that filing to him. Under *Palardy*, that is enough to make out a viable association claim. *See* 906 F.3d at 84 (holding that "evidence suggesting [Township administrator] harbored animosity toward [Palardy] because of his union affiliation" as "a union member and leader" was sufficient to survive summary judgment).

Defendants take a different view. They contend that, as in *Sanguigni*, Baloga's association claim "implicate[s] associational rights in essentially the same way and to the same degree," 968 F.2d at 400, that his speech claim does, so that the

17

public concern requirement is not per se satisfied and should be found wanting here.  But, as we explained in *Palardy*, that view is misplaced in the context of a retaliation claim based on union membership.  Baloga, like Palardy, is arguing not merely—or even principally—that he was punished for his speech specific to the subject of the Martin Luther King Jr. Day holiday but, rather, that he was penalized for his "affiliation" as "a union member and leader," *Palardy*, 906 F.3d at 84, of the union that had filed this and other grievances.  The substance of that latest grievance is simply irrelevant to his claim.  So understood, Baloga's association claim "implicate[s] associational rights" in a *different* way and to a *different* degree than his speech claim, and because union membership (and, *a fortiori*, leadership) necessarily involves a "public concern," summary judgment should not have been granted on the ground that this element was lacking.

## 2.    Balance of Interests

Having concluded that the public concern element does not bar Baloga's association claim, we consider whether we may nevertheless affirm on the ground that Baloga's associational interests are outweighed by the Defendants' interest in maintaining an efficient workplace and avoiding disruption. *See Pickering*, 391 U.S. at 568; *Watters*, 55 F.3d at 895.  We have not addressed the question whether that so-called "*Pickering* balancing" applies to pure association claims based on union membership and we need not do so today,[11] for

---

[11] *Pickering* and *Watters* both involved speech claims, and, in *Palardy*, we did not explicitly address whether *Pickering* balancing is required for union-based association claims.  Four circuits have concluded or suggested that it is,

18

even assuming it does, Defendants have not established as a matter of law that their interest outweighs Baloga's.

A public employer bears the burden of justifying an adverse action taken against an employee once the public concern element has been met. *See Baldassare*, 250 F.3d at 197–98. The weight of this burden "varies depending upon the nature of the employee's expression." *Id.* at 198. On one side of the scale is the employee's interest in associating with and acting on behalf of the union and the public's interest in unions serving the legitimate interests of their employee-members. *See Palardy*, 906 F.3d at 84; *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1061–62 (3d Cir. 1989). On the other side is the government-employer's interests in "promoting workplace efficiency and avoiding workplace disruption." *McGreevy v.*

---

*see Cook v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313, 1320–21 (11th Cir. 2005); *Boddie v. City of Columbus*, 989 F.2d 745, 748–50 (5th Cir. 1993); *Roberts*, 773 F.2d at 957; *see also Wilton v. Mayor & City Council of Balt.*, 772 F.2d 88, 91 (4th Cir. 1985) (not citing *Pickering* but holding that "a first amendment right to associate may be validly limited where the limitation is necessary to a substantial and legitimate state interest"), but one has held that courts should not undertake *Pickering* balancing where the union and the employer have a collective bargaining agreement, *see Shrum v. City of Coweta*, 449 F.3d 1132, 1139 (10th Cir. 2006). Here, the parties argue about the balancing of interests but do not raise or engage the threshold question whether such balancing is required in this context. We will assume without deciding that it is required here as we conclude that the balancing of interests would not justify summary judgment in any event.

19

*Stroup*, 413 F.3d 359, 364 (3d Cir. 2005) (citing *Pickering*, 391 U.S. at 568); *see Connick*, 461 U.S. at 150.

In balancing the competing interests, we consider "whether the [First Amendment activity] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the [employee's] duties or interferes with the regular operation of the enterprise." *Baldassare*, 250 F.3d at 198 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). This is a "fact-intensive" exercise, *Miller*, 544 F.3d at 548, and no single factor is dispositive, *Baldassare*, 250 F.3d at 198. Where the material facts are undisputed, the employee's association is protected as a matter of law unless the government's interest outweighs it. *See Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 980 (3d Cir. 1997); *O'Donnell*, 875 F.2d at 1062.

Defendants identify two interests that they contend outweigh Baloga's associational interests: first, that the District has unfettered discretion concerning when to move Baloga between the high school and the primary center; and second, the need to avoid the disruption that Baloga allegedly caused by bringing down employee morale. On this record, however, neither suffices to tip the balance in the Defendants' favor.

As for the first, Defendants can hardly carry their burden with the tautology that they are entitled to do as they please in any area normally subject to their discretion. If that were the case, few retaliation claims would survive *Pickering*

20

balancing.[12] Although a public institution undoubtedly has an interest in assigning employees according to its needs, it may not do so for the purpose of chilling the exercise of constitutional rights. Instead, in the context of a retaliation claim, it must articulate and substantiate a legitimate non-discriminatory reason for its actions. *See, e.g.*, *Miller*, 544 F.3d at 548 (including among an employer's interests "the employer's prerogative of removing employees *whose conduct impairs performance*" (emphasis added)); *Roberts*, 773 F.2d at 957 (explaining that an employee's associational right could be outweighed by the government's needs "if the employee engages in the allegedly protected activities on the job, interfering with the performance of his duties or if the employee harasses coworkers and disrupts operations" (citations omitted)).

A generalized interest in doing business-as-usual does not constitute such a reason and cannot categorically outweigh an employee's interest in associating with a union. This is particularly true where, as here, the institution asserting such an interest has explicitly sanctioned the existence of the union and the grievance procedure it employs by entering into a collective bargaining agreement. *See Shrum*, 449 F.3d at 1139 (explaining that a public employer's interest in efficient operations does not outweigh an employee's interest in union

---

[12] To the extent Defendants are arguing not an "interest" per se, but that they would have transferred Baloga even in the absence of his protected activity, that argument goes to causation, *see Reilly v. City of Atlantic City*, 532 F.3d 216, 232–33 (3d Cir. 2008), which we address separately below, *see infra* Section III.B.2.

21

association where the employer "already balanced those interests when it agreed to a collective bargaining agreement" and "presumably received the benefit of its bargain"); *PACE*, 730 F.2d at 263 ("[I]f a public employer voluntarily establishes a grievance procedure, then discriminates or retaliates against union members in administering that process, it violates the first amendment."); *see also Azzaro*, 110 F.3d at 980 ("By adopting a policy against sexual harassment and a process for reporting and dealing with it, [the] County had affirmatively recognized that complaints [in accordance with that policy] . . . do not pose an undue threat of disruption.").

As for their second proffered interest, the need to avoid disruption in the workplace is certainly legitimate. *See Rankin*, 483 U.S. at 388; *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 991 (3d Cir. 2014). But the scant evidence that Defendants provide of such disruption or the potential for such disruption, *see Watters*, 55 F.3d at 898–99, is not sufficient to outweigh Baloga's associational interests. Indeed, Defendants offer only Serino's self-serving hearsay testimony that other employees said Baloga was "bringing the morale . . . down" by "whining," JA 102, but adduced no employee testimony or other evidence that Baloga's union activities "impair[ed] discipline" by his superiors, impeded the performance of his duties, or interfered with the "regular operation of the enterprise," *Baldassare*, 250 F.3d at 198 (quoting *Rankin*, 483 U.S. at 388); *see Swineford v. Snyder Cty. Pa.*, 15 F.3d 1258, 1273 (3d Cir. 1994) (holding that the government's interest outweighed employee's where the government adduced evidence that "office conditions became intolerable" and the employee's conduct "had an adverse effect on the discharge of [her] duties"). Nor was Baloga's relationship with Serino—which is a "particularly important" consideration in the

22

balancing calculus, *Baldassare*, 250 F.3d at 198—"of such a personal and intimate nature" that Baloga's actions "would seriously undermine the effectiveness of the working relationship," *Pickering*, 391 U.S. at 570 n.3; *see De Ritis v. McGarrigle*, 861 F.3d 444, 458 (3d Cir. 2017) (finding highly relevant for the purposes of *Pickering* balancing the particularized need for strong relationships between employees and their manager in a small public defender's office where employees represented the positions of their supervisor in court). Our task is to weigh the opposing interests, and given how little Defendants have placed on their side of the scale, they have not succeeded in tipping the balance in their favor.

In sum, because Baloga's union membership involves a matter of public concern and Defendants have failed to establish that their purported interests in efficiency and avoiding disruption outweigh Baloga's associational interests, his conduct was protected by the First Amendment, and the District Court erred in holding otherwise.

### B. Remaining Elements of a Retaliation Claim

#### 1. Element Two: Adverse Action

Even assuming Baloga's conduct was protected, Defendants argue that summary judgment was justified because no reasonable jury could find Baloga's transfer back to the primary center to constitute an adverse action "sufficient to deter a person of ordinary firmness from exercising his constitutional rights." Appellees' Br. 41; *see Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000). We are not persuaded.

Whether a public employer's conduct rises to the level of an actionable wrong is "a fact intensive inquiry focusing on the status of the [employee], the status of the retaliator, the relationship between the [employee] and the retaliator, and the nature of the retaliatory acts." *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (emphasis omitted) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)). A public employer "adversely affects an employee's First Amendment rights . . . when it makes decisions, which relate to . . . *transfer* . . . based on the exercise of an employee's First Amendment rights." *Id.* (emphasis added) (quoting *Suarez Corp. Indus.*, 202 F.3d at 686).

Although the nature of the retaliatory acts committed by the public employer must "be more than *de minimis*," amounting to more than "criticism, false accusations, or verbal reprimands," *id.* (citation omitted), the threshold is "very low," *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006). Indeed, we have observed that "an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her" First Amendment right may suffice. *Suppan*, 203 F.3d at 234 (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990)).

In this case, Defendants urge that "any alleged adverse effect on Baloga due to his transfer was de minimis." Appellees' Br. 42. But a reasonable juror could conclude otherwise. Baloga testified that, due to his transfer being expedited and then effectively deemed permanent, he could no longer go home during his lunch hour approximately three months every year to help his wife with childcare responsibilities, and he could no longer work the shift that

24

allowed him to go home early from the high school at least once a month. He also attested to consequences for his actual job responsibilities and reputation: whereas he engaged in a number of "big projects" at the high school, he had no significant work to do at the primary center during the winter months because the fields were covered in snow, "reduc[ing him] to a mop and a broom." JA 38. We cannot say as a matter of law, then, that the alleged retaliation had no "adverse effect" for, viewed in the light most favorable to Baloga, the record supports the opposite inference.[13] *See Suppan*, 203 F.3d at 234–35 (holding that evidence of "stress" and "loss of reputation" from an unsatisfactory employment rating was sufficient to raise triable issue on adverse action); *see also Cook v. Gwinnett*, 414 F.3d 1313, 1318 (11th Cir. 2005) (deeming "los[s] [of] additional prestige and office responsibilities that came with being a team leader" sufficient to constitute adverse action); *Leary v. Daeschner*, 349 F.3d 888, 901 (6th Cir. 2003) (holding reputational harm stemming from involuntary transfer "from one school in the district to another" demonstrated sufficient adversity).

---

[13] In support of their argument, Defendants make much of the fact that the union itself continued to file grievances after Baloga's transfer. But the question here is not whether a union can operate after one of its members is retaliated against but whether an ordinary union member would be deterred from exercising his or her associational rights in the face of that retaliation. And given the "very low" threshold for that showing in the First Amendment retaliation context, *O'Connor*, 440 F.3d at 128, Baloga has put forth sufficient evidence to bring that question to a jury.

25

## 2.      Element Three: Causation

Defendants next argue that they are entitled to summary judgment based on Baloga's failure to prove the third element of a retaliation claim, causation.  Yet again, however, there remain disputed issues of material fact.

If a public employee makes out the first two elements of a retaliation claim, he then bears the initial burden of showing that his constitutionally protected conduct was a "substantial" or "motivating factor" in the allegedly retaliatory conduct.  *Suppan*, 203 F.3d at 235.  He can establish the requisite causal connection by showing either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[14]  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citation omitted).  If the employee makes out this prima facie case of retaliation, "the burden shifts to the [employer] to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct."  *Suppan*, 203 F.3d at 235 (internal quotation marks and citation omitted).  In view of the standard at summary judgment, that means that an employer, to prevail on causation, "must present evidence of such quality that no reasonable juror could conclude that the protected

---

[14] We have also observed that if such evidence is lacking, an employee may nevertheless prove causation "from the evidence gleaned from the record as a whole."  *Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018) (quoting *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016)).

activity was the but-for cause of the termination." *Hill v. City of Scranton*, 411 F.3d 118, 126 n.11 (3d Cir. 2005).

Here, Defendants do not dispute that Baloga put forward sufficient evidence to make out a prima facie case of causation.[15] Rather, they argue that they have met their burden

---

[15] This apparent concession is with good reason: The record contains ample evidence from which a reasonable juror could conclude that a causal link existed between Baloga's union activities and his transfer—either because "an unusually suggestive temporal proximity," *Lauren W.*, 480 F.3d at 267, existed between when the union filed the Martin Luther King Jr. Day grievance, when Serino approached Baloga about the grievance, and when Baloga was transferred to the primary center, given that all of the events occurred within the span of one week, *see Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) (explaining that temporal proximity can itself be sufficient to establish a causal link) or because of the combination of the temporal proximity and the evidence of Serino's animus toward the union more generally, *see id.* (holding that an employee who was terminated 10 days after engaging in protected conduct and whose boss had made negative comments about her protected conduct had put forth sufficient evidence from which a fact finder could determine the existence of a causal link); *see also Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 795 (3d Cir. 2000) ("Where a reasonable inference can be drawn that an employee's [protected conduct] was at least one factor considered by an employer in deciding whether to take action against the employee, the question of whether the [protected conduct] was

27

to show they would have transferred Baloga to the primary center in the absence of his protected conduct for two reasons: first, because they transferred him every year, and second, because it is undisputed that the District had hired more employees to work at the high school that school year, thereby obviating the need for Baloga to continue working there.

True though they may be, however, neither of those facts precludes a reasonable jury, considering the record as a whole, from finding causation. That the Defendants intended to transfer Baloga *at some point in the future* does not logically rebut Baloga's point that his union activity was the cause of his *accelerated* and apparently permanent transfer, which is the adverse action at issue. Nor is the fact that the District had hired more employees dispositive of whether it otherwise would have transferred Baloga at that time. To the contrary, the record reflects that, although one new hire was slated to begin work the Monday that Baloga was transferred, some, if not all, of the new employees were hired in March or April of 2015,[16] i.e., well before Baloga was even assigned to the high school, let alone transferred away from it. And at no point before this transfer was Baloga advised that his rotation to the high school would be any shorter than usual or that his job duties there were being assumed by others. Viewed in the light

---

a motivating factor in that determination is best left to the jury.").

[16] The record is not clear if the District hired two or three additional employees and, if three, when the third employee was hired. But even the employee who began in late-January was necessarily hired before that time.

most favorable to Baloga, this sequence supports an inference that, notwithstanding the new hires, the District assigned Baloga to the high school in January 2016 with the expectation that he would complete his normal two-to-three month rotation, and that retaliation, not a new hire, accounted for its sudden change of heart just three weeks into that assignment and on the very day of Baloga's conversation with Serino.

Other evidence also arguably supports that inference. As the District Court itself recognized, the "temporal proximity" between the union's filing of the Martin Luther King Jr. Day grievance and Baloga's transfer was "somewhat suggestive of a retaliatory motive." JA 8. And, likewise, the temporal proximity—mere hours—between Baloga's exchange with Serino in which Serino expressed anger over Baloga's "complaining" and threatened to "transfer [him] today," JA 215, and Baloga's being notified of his transfer effective the next business day raises questions about the credibility of Defendants' explanation for their actions, *cf. Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000) (explaining that temporal proximity between an employee's protected conduct and the employer's adverse action coupled with inconsistent reasons given for the action can call into doubt the employer's stated basis for the action). Also potentially probative to a jury are Serino's and Bang's alleged threats of reprisal for the union's activities, the testimony about Serino's general anti-union animus, and the myriad conflicting accounts about Appellees' motivation for Baloga's transfer in Serino's testimony, Rome's testimony, and Bangs' testimony.

While the District Court concluded that factors such as the transitory nature of Baloga's transfers and the fact of new

29

hires precluded summary judgment in Baloga's favor, it also recognized that the motivation for Baloga's transfer (were it to reach the question of causation) was "far from clear," JA 8, and, in view of the countervailing evidence, we must agree. Because a trier of fact could conclude on this record that Baloga would not have been transferred in the absence of his union activities, the quintessential "factual issue" of causation, *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 889 (3d Cir. 1997), remains, in this case, a question for the jury.

### C.   *Monell* Liability

The District next argues that even if Baloga can establish a constitutional violation, the District itself could not be held liable because there is no evidence that any municipal policy or custom caused that violation. *See Monell*, 436 U.S. at 690–91. A municipality may be held liable pursuant to 42 U.S.C. § 1983 only if a plaintiff is able to identify such a policy or custom. *See A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004). That requires a plaintiff to show, for a policy, that an official with final decision-making authority has "issue[d] an official proclamation, policy, or edict," *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990), or, for a custom, that a course of conduct, though not authorized by law, was "'so permanent and well settled' as to virtually constitute law," *id.* (quoting *Monell*, 436 U.S. at 690). In either case, the policymaker, as defined under state law, must be "responsible either for the policy or, through acquiescence, for the custom." *Andrews*, 895 F.2d at 1480–81.

We agree with the District Court that the record here does not support *Monell* liability. As Baloga's repeated

30

invocation of Superintendent Kevin Booth's authority demonstrates, Serino did not have final decision-making authority and thus was not a policymaker under Pennsylvania law. *See Brennan*, 350 F.3d at 428 ("[I]f a municipal employee's decision is subject to review, even discretionary review, it is not final and that employee is therefore not a policymaker for purposes of imposing municipal liability under § 1983."). There is also no evidence that those who do qualify as policymakers, such as Booth or the school board, knew about, much less approved, Baloga's transfer for an allegedly unconstitutional reason or delegated him final policymaking authority, as needed to impute liability to the municipality. *See Andrews*, 895 F.2d at 1481. On that basis, we will affirm the District Court's grant of summary judgment to the District.

## D. Qualified Immunity

Finally, Defendants argue that summary judgment was proper as to Serino because he is entitled to qualified immunity. The doctrine of qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Miller*, 544 F.3d at 547 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The analysis is guided by two questions: (1) did the government actor violate a constitutional right? and (2) was that right "clearly established" at the time of the challenged conduct? *See Dougherty*, 772 F.3d at 986. As Baloga has raised a triable issue concerning the violation of his First Amendment right to association, our analysis here focuses on the second prong of the qualified immunity analysis.

31

For a right to be clearly established, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (citation omitted). Although the right at issue may not be defined "at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), the precise action in question "need not have previously been held unlawful" for the right to be clearly established. *Dougherty*, 722 F.3d at 993 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). Where there is neither Supreme Court nor circuit precedent on point, "a robust consensus of cases of persuasive authority" may establish the federal right at issue. *al-Kidd*, 563 U.S. at 742 (citation omitted).

Here, Defendants contend that Serino is entitled to qualified immunity because "[t]here is no clearly established case law . . . that stands for the [proposition] that . . . a grievance about a day off[] constitutes constitutionally protected . . . association." Appellees' Br. 51. But Defendants misunderstand the right at issue. Viewing the facts in the light most favorable to Baloga, Serino retaliated against Baloga because he ascribed to him responsibility for the union's grievance based on his leadership of the union. Thus, the right at issue is a public employee's right not to be subjected to adverse treatment for his leadership role in a public union—not, as Defendants contend, for the content of the grievance that the union filed.

Once the right at issue is properly identified, it is apparent that "[t]he contours of [that] right," *Anderson*, 483 U.S. at 640, were clearly established when Serino ordered Baloga's transfer. The Supreme Court has long recognized the right to become a member of a union and the attendant right not to be penalized for that membership. *See, e.g.*, *Smith*, 441 U.S. at 465 ("The First Amendment . . . protects the right of associations to engage in advocacy on behalf of their members [and] [t]he government is prohibited from infringing upon [this right] either by a general prohibition against certain forms of advocacy or by imposing sanctions for the expression of particular views it opposes.") (citations omitted); *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969) ("[A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal . . . .'"); *Thomas v. Collins*, 323 U.S. 516, 532 (1945) (holding that a state may regulate labor unions but "[s]uch regulation . . . must not trespass upon the domain set apart for . . . free assembly").

So have we and other Courts of Appeals. *See, e.g.*, *Labov*, 809 F.2d at 222–23 ("Plainly efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action."); *Cook*, 414 F.3d at 1320 ("[T]he law is clearly established that public employees have a First Amendment right to engage in associative activity without retaliation . . . [and] courts have long held that freedom of association protection extends to membership in organizations such as labor unions.") (citations omitted); *Morfin*, 906 F.2d at 1439 ("The unconstitutionality of retaliating against an employee for participating in a union

33

[is] clearly established . . . ."); *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985) ("We have no doubt that an employee who is disciplined solely in retaliation for his membership in and support of a union states a valid first amendment claim . . . ."); *PACE*, 730 F.2d at 262 ("Th[e] right of association encompasses the right of public employees to join unions and the right of their unions to engage in advocacy and to petition government in their behalf.").

Given this "robust consensus," *al-Kidd*, 563 U.S. at 742, we have no difficulty concluding that Baloga's right not to face retaliation for his leadership role in a public union was clearly established at the relevant time and, thus, Serino is not entitled to qualified immunity.[17]

## IV. Conclusion

For the foregoing reasons, we will affirm in part and reverse in part the District Court's order granting summary judgment and will remand for further proceedings consistent with this opinion.

---

[17] Defendants also weakly suggest that it was not clearly established in 2016 that a public employer's retaliatory transfer would be actionable if it did not affect the employee's pay. The case law is to the contrary. *See Rutan*, 497 U.S. at 74–75, 75 n.8; *Brennan*, 350 F.3d at 419; *Suppan*, 203 F.3d at 234.

34