**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 22-2701 and 22-2702

_____

GEORGE FALCONE,

Appellant in No. 22-2701

v.

NEIL DICKSTEIN, Personally and in his capacity as the
Superintendent of Freehold Public Schools; MICHELLE
LAMBERT, Personally and in her capacity as the
President of the Freehold Board of Education; MICHAEL S.
AMOROSO, Personally and in his capacity as the Vice
President of the freehold board of education;
JENNIFER PATTEN, Personally and in her capacity as a
member of the freehold board of education; DEBRA
COSTANZA, Personally and in her capacity as a member of
the freehold board of education; ELENA O'SULLIVAN,
Personally and in her capacity as a member of the freehold
board of education; MARY COZZOLINO, Personally and in
her capacity as a member of the freehold board of education;
MEG THOMANN, Personally and in her capacity as a
member of the freehold board of education; NEIL
GARGIULO, Personally and in his capacity as a
member of the freehold board of education; KERRY
VENDITTOLI, Personally and as a member of the freehold
board of education; FREEHOLD BOARD OF EDUCATION;

FREEHOLD TOWNSHIP POLICE DEPARTMENT; MYROSLAV ALFELDI, Personally and in his capacity as a freehold township police officer; JOHN DOES 1-25, Said names being fictitious

GWYNETH K. MURRAY-NOLAN,

Appellant in No. 22-2702

v.

SCOTT RUBIN; KURT PETSCHOW; LISA CARBONE; TERRY DARLING; BRETT DRYER; WILLIAM HULSE; NICOLE SHERRIN KESSLER; MARIA LOIKITH; PATRICK LYNCH; KRISTEN MALLON; CRANFORD BOARD OF EDUCATION; JENNIFER OSBOURNE; SCIARRILLO CORNELL MERLINO MCKEEVER AND OSBOURNE LLC; JOHN DOES 1-25; ABC DEFENDANTS 1-25; ANTHONY SCIARRILLO; CRANFORD POLICE DEPARTMENT; NADIA JONES; ROBERT CHAMRA; DENNIS MCCAFFERY; LESLI RICE; ANTHONY GIANNICO

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action Nos. 3-22-cv-00921 and 2-22-cv-00801)
District Judges: Hon. Peter G. Sheridan and Hon. Evelyn Padin

_____

Argued on September 27, 2023

2

Before: KRAUSE, ROTH and AMBRO, <u>Circuit Judges</u>

(Opinion filed:  February 5, 2024)

Ronald A. Berutti **(Argued)**
Murray-Nolan Berutti
136 Central Avenue
2nd Floor
Clark, NJ  07066

Counsel for Appellants


Ruby Kumar-Thompson **(Argued)**
Cleary Giacobbe Alfieri & Jacobs
169 Ramapo Valley Road
Upper Level 105
Oakland, NJ  07436

Eric L. Harrison **(Argued)**
Methfessel & Werbel
2025 Lincoln Highway
Suite 200
Edison, NJ  08818

Eileen M. Ficaro **(Argued)**
Gregory S. Hyman
Brandon L. Wolff
Kaufman Dolowich & Voluck
1650 Market Street
One Liberty Place, Suite 4800
Philadelphia, PA  19103

John F. Gillick **(Argued)**
Rainone Coughlin Minchello
555 U.S. Highway 1 South
Suite 440
Iselin, NJ 08830

Counsel for Appellees

————

OPINION OF THE COURT

————

**AMBRO**, *Circuit Judge*

In the wake of the COVID-19 pandemic, federal, state, and local governments scrambled to implement policies to control the spread of the disease. These measures—which included mandates to wear face masks in public indoor spaces such as schools, businesses, and restaurants—spawned skepticism and debate. Some objectors voiced their discontent online, some turned to their elected representatives, and some asked the courts to intervene. Others took less trodden paths.

The plaintiffs in the consolidated cases before us, two New Jersey parents, chose to express their opposition through multiple means. One was to attend school board meetings while refusing to wear a mask in what they believed was a symbolic protest against masking requirements in schools. Their conduct led not to debate or policy changes but to a summons and an arrest.

The plaintiffs sued. The summons or arrest, they claimed, were retaliation for exercising their First Amendment

4

rights. The District Court in both cases dismissed the complaints, though on different grounds.

For the reasons that follow, we reverse and remand the Court's order against George Falcone and affirm the Court's order against Gwyneth Murray-Nolan. A question shadowing suits such as these is whether there is a First Amendment right to refuse to wear a protective mask as required by valid health and safety orders put in place during a recognized public health emergency. Like all courts to address this issue, we conclude there is not.

## I. Background

On March 9, 2020, New Jersey Governor Phil Murphy declared a state of emergency in response to the quickly spreading coronavirus known as COVID-19. N.J. Exec. Order No. 103; Falcone App. 61-68. As we now know, it primarily spreads through airborne particles that accumulate in enclosed spaces, respiratory droplets produced when a person coughs, sneezes, or talks, and occasionally through contact with objects contaminated with the virus. *How COVID-19 Spreads*, CDC (Aug. 11, 2022), https://perma.cc/EPP9-AUWT. Individuals infected with COVID-19 can spread the disease while asymptomatic or pre-symptomatic, making the virus difficult to control. Over the course of the ensuing months, Governor Murphy issued a series of Executive Orders to monitor and curb its spread. One of them mandated that New Jersey schools "maintain a policy regarding mandatory use of face masks by staff, students, and visitors in the indoor portion of the school district premises," except, for example, when an individual qualifies for and obtains a medical exemption. N.J. Exec. Order No. 251 (Aug. 6, 2021). The mandate was aimed at resuming in-person teaching and other activities while

5

reducing transmission of the virus and protecting unvaccinated individuals. Falcone App. 83. In preparation for the 2021-2022 school year, New Jersey School Districts—including the Freehold Township and Cranford Township School Districts—implemented mandatory indoor masking policies consistent with the Executive Order.

COVID-19 has since become endemic (that is, regularly recurring in particular areas or communities), and the statewide school mask mandate has been terminated. *See* N.J. Exec. Order No. 292 (Mar. 2, 2022). But litigation related to masking policies has not. In the cases before us, the plaintiffs separately brought suit against various groups of defendants claiming they were unlawfully retaliated against for protesting policies adopted by their local Boards of Education related to mandatory masking in schools. The cases stem from similar sets of facts and involve related issues of law, so we have consolidated them for review.

On appeal from the dismissal of a complaint, we take the factual allegations as true.

A. George Falcone

Falcone brought suit under 42 U.S.C § 1983 and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2(c), against the Superintendent of Freehold Public Schools, various members of the Freehold Township Board of Education ("BOE" or "Board"), as well as the Freehold Township Police Department and one of its officers, Myroslav

6

Alfeldi ("Police Defendants").[1] Falcone opposed the mandatory masking policy adopted by the Freehold BOE and voiced that opposition at Board meetings and via social media. Falcone App. 16. He "sought to drum up popular support for serving notice on the Board" that it was "liable for harming children with the mask mandate." *Id.* Some or all of the defendants allegedly knew of Falcone's vocal opposition and activities.

On February 8, 2022, the Freehold BOE held an indoor public meeting on School District premises. Joined by around fifteen other maskless individuals, Falcone entered the building without a mask "with the well[-]known intent to engage in protected political speech and activity regarding unmasking." *Id.* They were advised to wear a mask or else the meeting would not begin. In an "overt and obvious political protest against the Board's masking policies," Falcone responded that he would not put on a mask. *Id.* at 17. Some members of the BOE then called the Freehold Township Police Department for backup. When Officer Alfeldi arrived and insisted that Falcone wear a mask, he responded "that he was engaged in constitutionally protected activities, including his remaining unmasked, and that he would not put on a mask unless defendant Alfeldi advised that he would be arrested for not doing so." *Id.* Officer Alfeldi assured Falcone that he would not be arrested, so he remained maskless. Moments before the Board convened, Falcone "served what he believed were legal papers on each Board member." *Id.* He then spoke at the podium for public citizen speakers—still maskless—and was approached by a second police officer who again directed

---

[1] All Defendants in Falcone's lawsuit collectively are referred to as the "Freehold Defendants."

him to wear a mask. Falcone responded by pointing out that the officer himself was unmasked.

Following the meeting, Officer Alfeldi allegedly issued a summons and complaint charging Falcone with defiant trespass in violation of N.J. Stat. Ann. § 2C:18-3b(1), a misdemeanor. He was the only person among all maskless attendees to receive a summons, which he alleges was "clearly" in retaliation for his "protected political and symbolic speech, and organization thereof." Falcone App. 18. Two weeks later, the Board held another meeting. But when Falcone and several others attended it (again maskless) to "protest . . . defendants' actions and policies," the Board and Superintendent canceled the meeting. *Id.* at 19.

Falcone's lawsuit followed.[2] He alleged the Freehold Defendants unlawfully retaliated against him for exercising his First Amendment rights and deprived him of substantive due process.[3] They did so by (1) issuing, or conspiring to cause issuance of, a summons for trespass "in retaliation for hi[s] organizing and leading a constitutionally protected political and symbolic protest against the Board's masking policies," Falcone App. 19; Dist. Ct. Dkt. 13 at 20, and (2) canceling the second BOE meeting "with the purpose of depriving the plaintiff of his rights to speak," Falcone App. 20; Dist. Ct. Dkt.

---

[2] He filed his initial complaint on February 22, 2022, after he received the summons. He amended it on March 17, 2022, to add allegations pertaining to the BOE's cancellation of the second meeting.

[3] Falcone initially also sued under 42 U.S.C. § 1985 for conspiracy to violate his civil rights. He affirmatively abandoned that claim on appeal. *See* Appellant Br. 15 n.1.

13 at 20. He requested compensatory and punitive damages as well as injunctive relief. Falcone App. 20-21.

The Freehold Defendants moved to dismiss. They argued, among other things, that Falcone lacked standing to sue and that he failed to state a First Amendment retaliation claim because his refusal to wear a mask was not constitutionally protected conduct. *See* Dist. Ct. Dkt. 6 at 10-14, 18-19.

The District Court dismissed the amended complaint on the ground that Falcone had no standing to sue. It found his alleged injuries—the receipt of a summons and the Board's meeting cancellation—were not "traceable" to the BOE or Police Defendants but instead to Governor Murphy's Executive Order that the Board had to obey. Falcone App. 7-9. It followed, in the District Court's view, that Falcone's alleged injuries also were not "redressable" by injunctive relief because "an injunction directed at Defendants would not enjoin the Governor from implementing or enforcing a mask mandate." *Id.* at 9. Having found that Falcone lacked standing, the Court did not address the Freehold Defendants' remaining arguments. He appeals to us.

B. Gwyneth Murray-Nolan

Murray-Nolan is an "advocate for parental choice in masking children at school." Murray-Nolan App. 79. Her opposition to the Cranford Township BOE's masking requirement was also well known: she had testified before the State Assembly and Senate, posted on social media about "the harm to her own children, and to children generally, from masking in school," and voiced her concerns at Board meetings on at least six occasions. *Id.* at 84-85. In September 2021,

9

Murray-Nolan filed a Harassment, Intimidation and Bullying Complaint against the Superintendent of Cranford Public Schools, a Cranford school principal, and a school nurse claiming that Murray-Nolan's children were "the subject of an alleged retaliatory incident . . . related to the masks that they were wearing." *Id.* at 85.

Fast forward to January 24, 2022, when the Board held a public meeting on School premises. Murray-Nolan entered the building maskless "in a sign of silent protest against the Cranford School [Board's] masking policy, related Executive Orders, as well as the [Board's] lack of action related to unmasking children in schools," particularly "those with special needs." *Id.* at 79. By not wearing a mask, she was "showing solidarity with all such children" and "protesting the BOE's violation of their civil rights." *Id.* at 81. She sat in the front row, maskless, listening to virtual student presentations for about twenty minutes, when the BOE's legal counsel—Defendant Jennifer Osbourne—stated "that everyone in the room must be masked." *Id.* at 79-80. Murray-Nolan refused to take a mask that was offered to her, so Osbourne, after consulting with Superintendent Rubin, announced she would "contact law enforcement on anyone in attendance at the meeting who remained unmasked." *Id.* at 80. Murray-Nolan did not relent, so the Board, Osbourne, and Superintendent Rubin convened for a private meeting. During the ten-minute break, "almost all" attendees allegedly "removed their masks in solidarity with" Murray-Nolan. *Id.* The Board then canceled the meeting; hence the public comment portion never took place.

The next day, the Board posted a statement on the Cranford Public Schools' Facebook page explaining why the

meeting ended abruptly: "a member of the public" refused to wear a mask in violation of the BOE's masking policy. *Id.* at 81, 105-06. It noted that individuals who disagreed with this policy could attend Board meetings virtually and explained "the individual" was so informed and offered a mask but refused both times. *Id.* at 105. "Rather than contacting the police, the Board chose to end the meeting so it could be in compliance with the [Governor's] executive order." *Id.* The statement concluded by emphasizing that attendees would be expected to comply with the masking policy going forward. *Id.*

A few days later, Murray-Nolan spoke to the Chief of the Cranford Police to voice her concerns about the BOE's "threat to call the police," and the Chief allegedly insinuated that "no parent would be arrested for refusing to wear a mask at a BOE meeting." *Id.* at 83.

In anticipation of the Board's February 14, 2022, meeting, the Superintendent circulated an email explaining that any individuals wishing to attend the meeting in person would have to comply with the masking policy unless they qualified for a medical exemption. *Id.* at 83, 108-09. The email also referred to the Board's policy permitting it to "request[] assistance from law enforcement officers in the removal of a disorderly person when that person prevents or disrupts a meeting," and it asked that "residents [who] object to executive orders . . . focus [their] efforts on those individuals who either created the orders or who have the power to [e]ffect change[.]" *Id.* at 108-09. Believing that the email targeted her, Murray-Nolan posted in a Facebook group a "statement in response" explaining the origin and nature of her opposition to the BOE's masking requirement and asserting that "filing a lawsuit

11

against the state and the Governor was the only recourse for [her] kids." *Id.* at 113.

Rather than suing them, Murray-Nolan filed her initial complaint and an order to show cause against Superintendent Scott Rubin, various members of the Cranford BOE, and attorney Osbourne. She did so just before the February 14 meeting and served copies on them via email an hour before it began. When Murray-Nolan arrived at the School—again maskless—she was advised by an employee of the Board that "he was 'told' to call the police on [her] if she entered the building unmasked." Murray-Nolan App. 87. She countered that "not wearing a mask was politically protected free speech" and proceeded to enter. *Id.* at 88. She handed a courtesy copy of her complaint to the Board's secretary and sat down, still maskless. In the hallway, one of the Board's legal counsel, Defendant Anthony Sciarrillo, met with members of the Cranford Police to "alert them that he sought to have [Murray-Nolan] arrested if she did not place a mask on her face, to which the [Police Department] and the officers agreed." *Id.* at 89. Sciarrillo entered the meeting room, sat next to Murray-Nolan, and instructed her to put on a mask. *Id.* She responded by serving him a copy of the complaint. When Sciarrillo repeated his request, Murray-Nolan restated that "not wearing a mask was politically protected speech under the First Amendment." *Id.* at 89-90. Sciarrillo then signaled to the back of the room and toward the entrance of the conference room, where three police officers were watching. Shortly thereafter, they arrested her for defiant trespass under N.J. Stat. Ann. § 2C:18-3b, the same violation that led to Falcone's summons.

Murray-Nolan amended her initial complaint, thereby suing three groups of defendants under 42 U.S.C. § 1983 and

12

the NJCRA[4]: Superintendent Rubin and various members of the Cranford BOE (together, the "BOE Defendants"), the Board's two legal counsel ("Attorney Defendants"), and the Cranford Police Department and several police officers ("Police Defendants").[5]   As relevant here, Murray-Nolan alleged the Cranford Defendants retaliated against her for exercising her First Amendment rights when they canceled the first Board meeting, published "threats" via email and social media, and arrested her following her maskless attendance at the second meeting.  Murray-Nolan App. 94-95; Dist. Ct. Dkt. 13 at 15-16.[6]  She sought compensatory and punitive damages as well as injunctive relief.

The Cranford Defendants moved to dismiss, arguing, among other things, that Murray-Nolan lacked standing to sue

---

[4] Murray-Nolan also alleged that the Cranford Defendants conspired to deprive her of her civil rights in violation of 42 U.S.C. § 1985 and failed to prevent such a conspiracy in violation of § 1986.  Murray-Nolan App. 98, 100.  The District Court dismissed both counts.  Her claims under § 1983 and the NJCRA are the only ones at issue in this appeal.  *See* Reply Br. 10.

[5] All defendants in Murray-Nolan's lawsuit collectively are referred to as the "Cranford Defendants."

[6] Murray-Nolan's complaint did not specifically identify a First Amendment retaliation claim.  It alleged only that the Cranford Defendants "intentionally, recklessly, and/or negligently interfered with and have deprived and/or damaged the Plaintiff by violating her rights, privileges, and/or immunities." *See* Murray-Nolan App. 94-95.  Murray-Nolan specified that she was pressing a First Amendment retaliation claim in her opposition to the Cranford Defendants' separate motions to dismiss. *See* Dist. Ct. Dkt. 13 at 15; Dkt. 30 at 20.

13

and that her First Amendment retaliation claim failed because she did not allege any "constitutionally protected conduct." Dist. Ct. Dkt. 12 at 10-20; Dkt. 21 at 10-17, 21-26; Dkt. 27 at 9-15. The Attorney Defendants also contended they were not "state actors" for purposes of § 1983. Dkt. 21 at 17-20. And the Police Defendants asserted the retaliatory arrest claim failed because they had probable cause to arrest her and, in any event, they were entitled to qualified immunity. Dkt. 27 at 19-22.

The District Court rejected the Cranford Defendants' standing arguments but agreed Murray-Nolan failed to state a claim for First Amendment retaliation. Murray-Nolan App. 16-19, 22-26 (citing *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.* ("*FAIR*"), 547 U.S. 47, 66 (2006), and *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). Her alleged "right to appear at [the Board meetings] without a mask" was not "inherently expressive" conduct, it reasoned, but rather was expressive only "because she told Defendants that it was, and sued to prove it." *Id.* at 16-19, 22-26. The Court also found the Attorney Defendants were not "state actors," *id.* at 26-27, and Murray-Nolan's retaliatory arrest claim failed against the Police Defendants for the additional reason that they had probable cause to arrest her for willfully refusing to wear a mask, *id.* at 27-29. She also appeals.

## II. Jurisdiction and Standard of Review

The District Court in both cases had jurisdiction under 28 U.S.C. §§ 1331 and 1367, and we have jurisdiction under 28 U.S.C. § 1291. When reviewing a dismissal for lack of standing or failure to state a claim, we give it a fresh look. *See Free Speech Coal., Inc. v. Att'y Gen.*, 677 F.3d 519, 530 (3d Cir. 2012); *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210,

14

218 (3d Cir. 2015).  We accept the plaintiffs' well pled factual allegations as true and draw all reasonable inferences in their favor.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  But we disregard unsupported conclusions or legal conclusions couched as factual allegations.  *See Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013).

## III.    Discussion

Though we consolidated the cases for review, the issues before us are distinct.  We first address the District Court's order dismissing Falcone's suit for lack of standing.  The parties ask us to do more, but we begin and end our inquiry there.  We then turn to the District Court's order dismissing Murray-Nolan's suit for failure to state a claim.

### A.  Falcone - Standing

Falcone challenges the District Court's finding that he lacks standing to sue and is not entitled to injunctive relief.  Our standing inquiry is separate from any assessment of his claims' merits.  *See Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162 (3d Cir. 2017).  All we ask is whether Falcone plausibly alleges he was injured under his theory of the underlying legal claims. So, while we necessarily reference the "nature and source of the claims" he asserts, *id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)), we must not "confuse weakness on the merits with absence of Article III standing," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, LLC*, 576 U.S. 787, 800 (2015) (quoting *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011)).  Instead, we assume he would succeed, even if ultimate recovery is "uncertain or even unlikely."  *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019).

15

To satisfy the familiar requirements for Article III standing, Falcone (1) must have suffered injury in fact (2) that is fairly traceable to the challenged conduct and (3) redressable by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

As for injury, Falcone must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks omitted). In the context of a motion to dismiss, the "[i]njury-in-fact element is not Mount Everest," and Falcone need only allege "some specific, identifiable trifle of injury." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (quoting *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005)).

The Police Defendants no longer argue that Falcone failed to establish this requirement. Oral Argument at 22:45-55 (conceding that he has shown injury in fact). Wisely so. Falcone contends he was injured on receiving a criminal summons after exercising his First Amendment right to protest at a Board meeting. The District Court ruled, and we agree, that receipt of a summons can be a tangible injury for standing purposes. *Cf. Smith v. Campbell*, 782 F.3d 93, 99 n.4 (2d Cir. 2015) (assuming that issuance of traffic ticket can constitute injury).

Falcone also claims he was injured when the Board canceled the second meeting to prevent him from exercising his constitutional rights. At oral argument, counsel for the BOE Defendants appeared to suggest that the meeting cancellation cannot cause an individualized injury because

16

others were likewise prevented from speaking. Oral Argument at 44:31-42. Of course, canceling or rescheduling a meeting in the normal course does not inflict an Article III injury, but Falcone alleges that the meeting was canceled specifically for the purpose of preventing him from speaking in that forum. Conduct undertaken to curtail someone's First Amendment rights does not become less injurious or non-retaliatory just because it has collateral consequences for other people. We are also unconvinced by the BOE counsel's contention that Falcone was not injured by the meeting cancellation because he might have an opportunity to speak at a later meeting. Oral Argument at 47:00-51. That argument may fare well as a response to the merits of Falcone's substantive due process violation claim, but it does not help Defendants' standing challenge. "[A]lleged First Amendment free speech violations are concrete and particular injuries for purposes of Article III standing." *Henry v. Att'y Gen., Alabama*, 45 F.4th 1272, 1288 (11th Cir. 2022). That the Board did not indefinitely prevent Falcone from speaking is of no moment. *Cf. Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citation omitted)). So far, we agree with the District Court.

Next, we consider whether Falcone's alleged injuries are "fairly traceable" to the Freehold Defendants' conduct. The District Court held that they are not because "the mask mandate emanated from the Governor's Executive Order and the BOE was obligated to comply with it." Falcone App. 7-9. Falcone contends the Court erred in so holding because it misconstrued his complaint as a challenge to the mask mandate. Appellant Br. 9-11. We agree. Falcone does not claim he was injured from "having to wear a mask" and he does

17

not—at least in this suit—challenge the constitutionality of the mask mandate or the permissibility of the Board's masking policy. Instead, he alleges the Freehold Defendants retaliated against him for his views by issuing a criminal summons and canceling the second Board meeting to prevent him from speaking. They cannot hide behind the Governor's Executive Order when it is their specific actions that allegedly harmed Falcone.

We disagree with the BOE Defendants that the issuance of the summons is not traceable to them. Oral Argument at 40:54-41:16. Falcone claims the Board "conspired" or "cooperated" with the police to issue the summons. Falcone App. 19; Appellant Br. 17. Although that claim may not survive a Rule 12(b)(6) motion to dismiss, it suffices for purposes of our standing inquiry. We agree with the Police Defendants, however, that the cancellation of the Board meeting is not traceable to them, as Falcone does not allege they had any part in it. *See* Police Defs. Br. 13.

Third, we consider whether Falcone has established that his injury can be redressed by a favorable court decision. The remedy he seeks need not be complete or relieve every injury alleged to satisfy Article III standing. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement." (quotation marks and citation omitted)). Falcone requested both monetary damages and injunctive relief, seeking to prevent the defendants from (1) threatening arrest, summons, or complaint to people attending in-person Board meetings and exercising their "constitutional rights," (2) threatening, intimidating, or coercing him or any other person "in an attempt to chill the[ir] First Amendment rights," and (3)

18

taking further retaliatory action against him. *See* Falcone App. 20-21.

The District Court correctly held that Falcone is not entitled to injunctive relief, and he conceded as much at oral argument. Our basis, however, parts from that of the Court. It denied this relief because "an injunction directed at Defendants would not enjoin the Governor from implementing or enforcing a mask mandate." Falcone App. 9. As noted, Falcone is not challenging the mask requirement or requesting an injunction barring its enforcement. For the sake of completeness, the relief he sought is improper, first, because all his injunctive requests are impermissibly overbroad "obey-the-law" orders, which are unenforceable for lack of specificity. *See, e.g.*, *Belitskus v. Pizzingrilli*, 343 F.3d 632, 650 (3d Cir. 2003). Second, Falcone has alleged no facts on the Freehold Defendants' intent to engage in the challenged conduct again. Without showing a likelihood or immediate threat of future harm, a plaintiff cannot obtain standing for prospective relief. *Brown v. Fauver*, 819 F.2d 395, 400 (3d Cir. 1987) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

As Falcone observes, however, he also seeks money damages for his past injuries. Falcone App. 20-21; Reply Br. 6. That his alleged injuries are difficult to quantify is irrelevant. In a § 1983 case, where the plaintiff's rights were violated but the violation did not result in any injury calling for compensatory damages, a request even for "nominal damages satisfies the redressability element of standing." *Uzuegbunam*, 141 S. Ct. at 801-02. Falcone's monetary damages claim suffices to establish redressability, and it survives.

Falcone has shown all three elements of standing by alleging he received a criminal summons and was deprived of his right to speak in retaliation for exercising his First Amendment rights. The District Court erred in dismissing his claims for lack of standing. Accordingly, we reverse and remand for it to consider the Freehold Defendants' Rule 12(b)(6) arguments in the first instance. *See Shorter v. United States*, 12 F.4th 366, 375 n.9 (3d Cir. 2021) ("[I]n the absence of exceptional circumstances, we decline to consider an issue not passed upon below."). This is not to say, of course, that Falcone's claims are likely to survive. On remand, the District Court may wish to consider, for example, if Falcone has forfeited any theory that the "constitutionally protected conduct" undergirding his First Amendment retaliation claim is something other than his refusal to wear a mask. Arguably he did, as he repeatedly claimed that "not wearing a mask is politically protected freedom of speech" and that he was "retaliated against for actions which were akin to pure speech." Dist. Ct. Dkt. 9 at 10; Dkt. 13 at 8.

## B. Murray Nolan - First Amendment Retaliation

Murray-Nolan's amended complaint survived the Cranford and BOE Defendants' attack for lack of standing, and correctly so.[7] But the District Court dismissed her First

---

[7] The BOE Defendants challenge the District Court's standing analysis, claiming Murray-Nolan's injuries are (1) not traceable to them but instead to the Governor, and (2) not redressable by an injunction. We disagree with the first argument for the reasons just stated. We agree with the BOE Defendants (as did the District Court) that Murray-Nolan is not

Amendment retaliation claim under § 1983 and the NJCRA for failing to allege constitutionally protected conduct, a component of such a claim.

To prevail, Murray-Nolan must establish that (1) she engaged in conduct protected by a right in the Constitution, (2) the Cranford Defendants "engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights," and (3) a "causal link" existed between the protected activity and the retaliatory action. *Palardy v. Township of Millburn*, 906 F.3d 76, 80-81 (3d Cir. 2018) (quotation marks and citation omitted).[8] Ordinarily, Murray-Nolan would need to demonstrate at the outset that all defendants are "state actors" because § 1983 authorizes suits for violation of federal rights only against

entitled to injunctive relief though, as explained, she is entitled to monetary damages and so has standing to sue.

We decline to consider Murray-Nolan's argument raised in her reply brief that the District Court erred in holding she was not entitled to injunctive relief because she never raised it in her opening brief. *See Garza v. Citigroup Inc.*, 881 F.3d 277, 284-85 (3d Cir. 2018). But we understand from our exchange with counsel during oral argument that Murray-Nolan concedes she is not entitled to the relief she requested. Oral Argument at 1:26:15-27:41.

[8] As noted, Murray-Nolan asserts a First Amendment retaliation claim under both § 1983 and the NJCRA, New Jersey's state-law analogue. N.J. Stat. Ann. § 10:6-2(c). Because the NJCRA is interpreted analogously to § 1983, our analysis applies equally to that statute. *See Perez v. Zagami, LLC*, 94 A.3d 869, 877 (N.J. 2014); *Filgueiras v. Newark Pub. Schs.*, 45 A.3d 986, 997 (N.J. Super. Ct. App. Div. 2012).

persons or entities who acted "under color of law." *See* 42 U.S.C. § 1983; *Groman v. Township of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995). In limited circumstances, even private parties like the Attorney Defendants here may be treated as state actors. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). They dispute their status as such. Although it is not obvious to us that their actions meet that threshold, we assume for purposes of our analysis that they do.

The District Court, as noted, held that Murray-Nolan's First Amendment claim faltered by failing to show that her refusal to wear a mask was constitutionally protected conduct. She argues the Court erred because it "fail[ed] to analyze the retaliatory nature of her arrest" and to "recognize that the nature of [her] First Amendment protest was well known to all defendants." Appellant Br. 23. But of course the District Court was not required to address those issues after finding Murray-Nolan's conduct was not constitutionally protected.

To be sure, the First Amendment protects not only "the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). It also applies to some conduct in some settings, as circumstances matter. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968). The Supreme Court has limited First Amendment protections to what it has called "inherently expressive" conduct. *FAIR*, 547 U.S. at 66. To qualify, an action must satisfy two elements: the actor must "inten[d] to convey a particularized message," and there must be a high "likelihood" that "the message [will] be understood by those who view[] it." *Johnson*, 491 U.S. at 404 (quoting *Spence v.*

22

*Washington*, 418 U.S. 405, 410-11 (1974)).[9]  The first element does not pose a high bar, but the second is trickier.  That is so because a viewer must be able to understand the message from the conduct alone.  *See FAIR*, 547 U.S. at 66.  If some "explanatory speech is necessary," the conduct does not warrant protection; otherwise, a party "could always transform conduct into 'speech' simply by talking about it."  *Id.*

Hence context comes into play.  *See Spence*, 418 U.S. at 410.  It is what separates activity that is sufficiently expressive from similar activity that is not.  For example, the burning of the American flag in *Johnson* was expressive because it occurred during a "political demonstration" against President Reagan's policies.  491 U.S. at 405-06.  Likewise, the taping of a peace sign to the American flag in *Spence* was expressive because it was "roughly simultaneous with and concededly triggered by the Cambodian incursion [during the Vietnam conflict] and the Kent State tragedy."  418 U.S. at 410.  And in *Tinker*, students' wearing of black armbands to protest American military involvement was expressive because it "conveyed an unmistakable message about a contemporaneous issue of intense public concern—the Vietnam hostilities."  *Id.* (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969)).

---

[9] Paradigms of protected conduct-based speech are the burning of the American flag as part of a political demonstration, *see id.* at 404-06, students' wearing of black armbands to protest American military involvement in Vietnam, *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969), and sit-ins by black persons in "whites only" areas to protest racial segregation, *see Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966).

Against this backdrop, we consider whether the First Amendment protects Murray-Nolan's refusal to wear a COVID mask at a Board meeting when doing so was required by an Executive Order implemented by Board policy. The first element—the intent to convey a particularized message—is easily met here. Murray-Nolan alleged she refused to wear a mask to "silent[ly] protest" the Board and Superintendent's "lack of action related to unmasking children in schools, particularly those with medical conditions and special needs." Appellant Br. 6-7; Murray-Nolan App. 39, 79; *see also* Appellant Br. 8, 23. Her mask refusal, she explains, was a sign of "solidarity with all such children in protesting the Board's violation of their civil rights." Appellant Br. 8.

But Murray-Nolan cannot satisfy the second element because it is unlikely that a reasonable observer would understand her message simply from seeing her unmasked at the Board meeting. She claims that, "in the then-existing political climate[,] refusing to wear a mask itself was an overt political statement." Appellant Br. 6. We have no doubt that, during the pandemic, some people refused to wear a mask to send a political message. But the problem for Murray-Nolan is that going maskless is not usually imbued with symbolic meaning. The Governor's Executive Order, for example, exempted individuals from the masking requirement for medical reasons. How would attendees know that Murray-Nolan was unmasked not because she was medically exempt but because she intended to express her dismay with the Board's inaction related to unmasking of school children? They wouldn't, unless they were aware of her vocal protests predating her maskless appearance at the meeting. She concedes as much by contending that Defendants "knew why [she] engaged in a long-standing silent protest" because of her

24

"vocal protests through her speeches about their inaction." Appellant Br. 20. Furthermore, how would attendees know what "particularized message" Murray-Nolan sent by refusing to wear a mask? Was it general defiance of the government? Skepticism toward government health experts? Opposition to the Governor's mask mandate? Or, as she alleges, opposition to the Board's and Superintendent's "lack of action related to unmasking children in schools, particularly those with medical conditions and special needs"? Murray-Nolan App. 79. Again, her message was susceptible to multiple interpretations, and understanding it required additional "explanatory speech." *FAIR*, 547 U.S. at 66.

Unlike burning a flag, wearing a medical mask—or refusing to do so—is not the type of thing someone typically does as "a form of symbolism." *Spence*, 418 U.S. at 410. The American flag is inherently symbolic. *See Johnson*, 491 U.S. at 405. A medical mask is not. It is a safety device— "protective equipment" used "to protect the wearer from particles or from liquid contaminating the face." *N95 Respirators, Surgical Masks, Face Masks, and Barrier Face Coverings*, FDA (Mar. 10, 2023), https://perma.cc/E8FM-2M2K. To combat COVID-19, people wear it to curb the spread of an airborne disease. Skeptics are free to—and did— voice their opposition through multiple means, but disobeying a masking requirement is not one of them. One could not, for example, refuse to pay taxes to express the belief that "taxes are theft." Nor could one refuse to wear a motorcycle helmet as a symbolic protest against a state law requiring them. The binary choice envisioned by Murray-Nolan—either disobeying the Executive Order mandating the wearing of a protective mask or not speaking at all—is a false one. *See* Appellant Br.

30-31.  We thus agree with the District Court that her refusal to wear a mask was not constitutionally protected.[10]

[10]Every court to address the issue has reached the same conclusion. *See, e.g.*, *Denis v. Ige*, 538 F. Supp. 3d 1063, 1079 (D. Haw. 2021) (Hawaii mask mandate did not infringe on First Amendment freedom of speech because it targeted "conduct" rather than "speech"; "wearing a mask in public . . . does not include a significant expressive element"); *Stewart v. Justice*, 502 F. Supp. 3d 1057, 1066 (S.D. W. Va. 2020) ("[A]lthough Plaintiffs feel that refusing to wear a face covering expresses 'nonconformity with unconstitutional and un-American laws,' that meaning is not 'overwhelmingly apparent.'" (citation omitted)); *Minn. Voters All. v. Walz*, 492 F. Supp. 3d 822, 837-38 (D. Minn. 2020) ("[T]he conduct [of not wearing a face mask] is not inherently expressive . . . . Absent explanation, the observer would not know whether the person is exempt from [the Executive Order], or simply forgot to bring a face covering, or is trying to convey a political message."); *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 237 (D. Md. 2020) ("[E]specially in the context of COVID-19, wearing a face covering would be viewed as a means of preventing the spread of COVID-19, not as expressing any message."), *appeal dismissed*, No. 20-1579, 2020 WL 6787532 (4th Cir. July 6, 2020), *and aff'd in part, appeal dismissed in part*, No. 20-2311, 2022 WL 1449180 (4th Cir. May 9, 2022); *Zinman v. Nova Se. Univ., Inc.*, No. 21-CV-60723, 2021 WL 4025722, at *13 (S.D. Fla. Aug. 30, 2021) ("[N]either wearing or not wearing a mask is inherently expressive.  In the context of COVID-19, wearing a mask does not evince an intent to send a message of subservience to authority – or any message at all."), *report and*

To the extent Murray-Nolan's First Amendment retaliation claim is based on a different theory—that she was punished for some other protected conduct—we deem that argument forfeited. To be sure, in addition to claiming that her

*recommendation adopted sub nom. Zinman v. Nova Se. Univ.*, No. 21-CIV-60723, 2021 WL 4226028 (S.D. Fla. Sept. 15, 2021), *aff'd sub nom. Zinman v. Nova Se. Univ., Inc.*, No. 21-13476, 2023 WL 2669904 (11th Cir. Mar. 29, 2023); *Whitfield v. Cuyahoga Cnty. Pub. Libr. Found.*, No. 21 CV 0031, 2021 WL 1964360, at *3 (N.D. Ohio May 17, 2021) ("[W]earing a mask is not a symbolic or expressive gesture. It is a health and safety measure put into effect in many public establishments to prevent the spread of COVID-19 to employees and other patrons."); *Nowlin v. Pritzker*, No. 20-CV-1229, 2021 WL 669333, at *5 (C.D. Ill. Feb. 17, 2021) ("Plaintiffs challenge orders that regulate non-expressive conduct such as keeping certain distance[s], wearing masks, and limiting gathering sizes. These activities are not speech[,] and regulations that govern non-expressive conduct do not bring the First Amendment into play."), *aff'd as modified*, 34 F.4th 629 (7th Cir. 2022); *Reinoehl v. Whitmer*, No. 21-CV-61, 2022 WL 1110273, at *3 (W.D. Mich. Feb. 3, 2022) (rejecting claim that "refusal to comply with [Michigan's Face Mask Order] constitutes symbolic speech"), *report and recommendation adopted*, No. 21-CV-61, 2022 WL 855266 (W.D. Mich. Mar. 23, 2022), *aff'd*, No. 22-1343, 2023 WL 3046052 (6th Cir. Apr. 17, 2023), *cert. denied*, No. 23-89, 2023 WL 6378554 (U.S. Oct. 2, 2023); *see also Sehmel v. Shah*, 514 P.3d 1238, 1243-44 (Wash. Ct. App. 2022) ("[W]earing or not wearing a mask is not sufficiently expressive so as to implicate First Amendment protections. . . . [T]here is a host of reasons why a person may not be wearing a mask.").

conduct constituted protected speech, Murray-Nolan also alleged she was engaged in other types of speech—for example, her testimony about mask injuries before the State Assembly and Senate, "countless social media posts" related to "the harm to her own children, and to children generally, from masking in schools," and her filing of a complaint against the Board, Murray-Nolan App. 84, 87—but she never ties that speech to Defendants' allegedly retaliatory arrest. Rather, she alleged that, because of her other speech, Defendants understood the nature of her protest. *See, e.g.*, Murray-Nolan App. 84, 88, 90. The only form of "speech" she links to her arrest is her refusal to wear a mask. *See* Murray-Nolan App. 90 (alleging she was arrested under the guise of a "rule of the building" for "making a constitutionally protected political statement by not wearing a mask"); Murray-Nolan App. 91 (alleging Defendants had a "pre-planned" agreement "that the Plaintiff should be arrested if she did not comply with [Sciarrillo's] command to wear a mask").

Furthermore, in response to Defendants' motions to dismiss, Murray-Nolan squarely argued her "constitutionally protected activity" underlying her First Amendment retaliation claim was her "not wearing a mask." *See* Dist. Ct. Dkt. 13 at 16, Dkt. 30 at 21; Dkt. 39 at 16. That is why the District Court dismissed her claim for failing to allege she was engaged in conduct accorded First Amendment protection.

On appeal, Murray-Nolan never argued the District Court somehow misread her allegation. Instead, she disagrees with its holding. For instance, she claims "not wearing a mask was politically protected free speech," especially "in the then-existing political climate," and contends "not wearing a mask in a public meeting" "touched upon" core First Amendment

28

speech concerning "politics, nationalism, religion, or other matters of opinion." Appellant Br. 6, 13, 26 (citation omitted). She repeatedly refers to her "First Amendment protest" or "First Amendment rights to protest." *Id.* at 28. Murray-Nolan quibbles with the District Court's reasoning that her refusal to wear a mask was not "inherently expressive" by pointing to her "'overwhelmingly apparent' speech that had been ongoing in multiple forums for months," claiming that her masklessness "was overtly political and was intentional and was overwhelmingly apparent." *Id.* at 30. She also argues that being maskless at the meeting was the only way she could express her views—"being unmasked on a video screen from her home was o[f] no value to [her] protest and would have defeated it altogether." *Id.* at 31.

These arguments carry over in Murray-Nolan's reply brief. "[T]he Board," she argues, "made clear that they would retaliate against [her] for not wearing a mask." Reply Br. 4. She reiterates "she was engaged in a constitutionally protected free speech protest," "had a right to be in the Board Room without a mask since she was engaged in a constitutionally protected protest," and "was arrested while admittedly . . . exercising constitutional rights." *Id.* at 13. The brunt of her argument thus rests on defending her position that her maskless protest was protected speech and claiming that Defendants were aware of the nature and purpose of that protest. *See* Appellant Br. 6-7, 20, 22.

We recognize Murray-Nolan also makes stray references to other forms of speech as she did in her amended complaint. *See* Appellant Br. 21-22, 27-28. But we are not convinced that she now presses a new theory of protected conduct. Indeed, our exchange with counsel for Falcone and

29

Murray-Nolan during oral argument dispelled any doubt we might have had. When asked, "What is the constitutionally protected activity that you are telling us exists here?," counsel responded: "We have a right to come in unmasked, it's symbolic speech to protest the masking policies that were in place." Oral Argument at 8:30-43.

Even assuming Murray-Nolan now claims she was retaliated against for being a vocal critic of the Board and its policies, she forfeited that argument because she never raised it in the District Court. *See United States v. Dowdell*, 70 F.4th 134, 141 (3d Cir. 2023). Our forfeiture doctrine "protect[s] litigants from unfair surprise[,] promot[es] the finality of judgments[,] conserv[es] judicial resources[,] and prevent[s] district courts from being reversed on grounds that were never urged or argued before [them]." *Id.* (final alteration in original) (quoting *Webb v. City of Philadelphia*, 562 F.3d 256, 263 (3d Cir. 2009)). These interests are directly implicated here, where Defendants staked their defense, and the District Court ruled, on Murray-Nolan's announced theory that Defendants retaliated against her for refusing to wear a mask. Though we have discretion to reach forfeited issues, we see no "truly 'exceptional circumstances'" that would excuse forfeiture here. *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 146-47 (3d Cir. 2017) (citation omitted).

Because Murray-Nolan failed to allege that she was engaged in constitutionally protected conduct, the District Court properly dismissed her First Amendment retaliation claim under § 1983 and the NJCRA, and we affirm on that basis alone. But even if we assume she properly pled that her arrest resulted from engagement in other constitutionally protected speech—be that filing a lawsuit against the Board,

"public writings," or "vocal" opposition to the Board's actions—her First Amendment retaliation claim still cannot succeed.

As noted, Murray-Nolan also must show that Defendants engaged in "retaliatory action" and "a causal link" exists between the protected conduct and the retaliatory action. *Palardy*, 906 F.3d at 80-81. She identifies two "retaliatory actions": her arrest and the Board's cancellation of the January 24, 2022, meeting.[11] We address each in turn.

There is no dispute that an arrest constitutes conduct "sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights." *Id.* (quoting *Thomas v. Independence Township*, 463 F.3d 285, 296 (3d Cir. 2006)). But the existence of probable cause "generally defeat[s] a First Amendment retaliatory arrest claim." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019). The District Court found, and we agree, that the Police Defendants had probable cause to arrest Murray-Nolan for defiant trespass under N.J. Stat. Ann. § 2C:18-3b. Murray-Nolan App. 28-29. That subsection

---

[11] As we read her briefs, the only retaliatory action she identifies is her arrest. *See* Appellant Br. 32 ("[D]efendants took action which would deter a person of ordinary firmness from engaging in such protected conduct[.] . . . Permitting defendants to silence Ms. Murray-Nolan with an arrest is to permit the defeat of the First Amendment[.]"); *see also id.* at 36-38 (arguing "false arrest" claim against Police Defendants). At oral argument, however, counsel asserted that Murray-Nolan also claimed the Cranford Defendants retaliated against her by canceling the Board meeting, thereby preventing her from speaking. Oral Argument at 52:48-53:30.

31

makes it illegal to knowingly "enter[] or remain[] in any place as to which notice against trespass is given by . . . [a]ctual communication to the actor [or] [p]osting in a manner prescribed by law or reasonably likely to come to the attention of intruders." N.J. Stat. Ann. § 2C:18-3b. Murray-Nolan was repeatedly instructed to comply with the masking policy and informed that the Board would call in law enforcement if she entered the building maskless. The Board also published a statement on Facebook after the January 24 meeting (which Murray-Nolan read) requesting compliance with the masking policy, and the Superintendent sent an email (which Murray-Nolan also read) explicitly referring to the Board's policy permitting it to "request[] . . . assistance from law enforcement officers in the removal of a disorderly person when that person prevents or disrupts a meeting." Murray-Nolan App. 105, 108-09. Prior to Murray-Nolan's arrest, furthermore, a police officer again reminded her that she "must wear a mask" and that refusing to do so violated a "rule of the building." Murray-Nolan App. 90.

Murray-Nolan knew she was violating a well-publicized masking policy and could not attend the Board meeting without a mask, but she did so anyway. The police thus had ample reason to arrest her for defiant trespass. *See Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003) (probable cause exists where "facts and circumstances within the officer's knowledge" are "sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense" (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Murray-Nolan's response, that the arresting officer allegedly agreed "she was engaged in a constitutionally protected free speech protest," Reply Br. 13, is unavailing because the officer's

32

subjective beliefs are "simply 'irrelevant'" and provide "no basis for invalidating an arrest." *Nieves*, 139 S. Ct. at 1725 (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153, 155 (2004)).

Ordinarily, our conclusion that probable cause existed would doom Murray-Nolan's retaliatory arrest claim. However, in *Nieves* the Supreme Court carved out a narrow exception to that general rule. *See id.* at 1727. A plaintiff need not establish the absence of probable cause "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* For this exception to apply, a plaintiff must present "objective evidence that [she] was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* The Supreme Court provided the example of jaywalking, which "is endemic but rarely results in arrest." *Id.* Thus, "[i]f an individual who has been vocally complaining about police conduct is arrested for jaywalking," the claim should not be dismissed despite the existence of probable cause because, "[i]n such a case, . . . probable cause does little to prove or disprove the causal connection between animus and injury." *Id.*

In her reply brief, Murray-Nolan contends that *Nieves*'s narrow exception applies because "people similarly situated as [her] were not arrested for attending board meetings unmasked when they were not necessarily long-standing anti-mask protestors for children in schools." Reply Br. 15. That conclusory statement is not supported by any facts pled in her amended complaint. Murray-Nolan never alleged selective enforcement or any facts sufficient to demonstrate a "facial plausibility" that police commonly see violations of masking

33

mandates and fail to make arrests. *Ashcroft*, 556 U.S. at 678. Nor did she advance this argument in the District Court.

If she asks us to infer an allegation of selective enforcement from her assertion that, at the first Board meeting, others allegedly "removed their masks in solidarity with [her]," Murray-Nolan App. 80, there is a temporal disconnect. Murray-Nolan was not then singled out among other maskless attendees. Rather, she was arrested after she tried to attend the *second* Board meeting without a mask (following multiple explicit warnings that doing so was prohibited). And she nowhere claims that anyone else defied the Board's instructions and attended the second meeting without a mask. All we can discern from her amended complaint is that one, and only one, individual—Murray-Nolan—repeatedly disregarded the masking mandate and was eventually arrested for doing so. She thus cannot find refuge in *Nieves*'s exception.

So we turn to her argument that the Cranford Defendants retaliated against her by canceling the January 24 meeting, where Murray-Nolan made her first maskless appearance. At the outset, we note that she has no retaliation claim against the Police Defendants because she does not allege they played any role in the Board's decision to cancel the meeting. Instead, she claims the Board and Attorney Defendants did so, thereby depriving her of a forum to exercise her right to speak.

We assume the meeting cancellation is "sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights" and focus our analysis on the third prong of the analytical framework: whether Murray-Nolan has

34

demonstrated the necessary causal link between the constitutionally protected conduct and the retaliatory action. *Palardy*, 906 F.3d at 80-81. We have recognized that protected activity close in time to the alleged retaliatory action may indicate one caused the other. *See Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) ("[A] suggestive temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation.").

Murray-Nolan does not attempt to explain how her "other" protected conduct is linked to the Board's decision to cancel the January 24 meeting. That makes sense because, as noted, she consistently claimed the Cranford Defendants retaliated against her for refusing to wear a mask, not for engaging in constitutionally protected speech. In any event, there is no temporal proximity or any other causal link here, no matter which activity we consider.

It appears the cancellation of the January 24 meeting had nothing to do with Murray-Nolan's lawsuit against the Board and its attorneys, which she filed on February 14, 2022, roughly three weeks *after* the meeting was suspended. As for her "public writings" and other "vocal" criticism—*e.g.*, her testimony before the state legislature, her social media posts, and her prior speeches at Board meetings—the amended complaint is silent as to their timing. But even assuming these alleged protected activities occurred just before the January 24 meeting, there is an obvious break in the chain of causation: Murray-Nolan's refusal to wear a mask at that meeting. That act is not constitutionally protected conduct and thus provides a straightforward, non-retaliatory explanation for the Board's decision to cancel the session. *See Lamont v. New Jersey*, 637

35

F.3d 177, 185 (3d Cir. 2011) ("A superseding cause breaks the chain of proximate causation."). Nothing in the record would allow Murray-Nolan to establish the constitutional causation necessary for her retaliation claim. We affirm the District Court's order on that alternative basis.

\* \* \* \* \*

The plaintiffs allege they were punished in retaliation for refusing to wear a COVID-protective mask at Board of Education meetings. Falcone claims he received a criminal summons after exercising his First Amendment right to protest, maskless, at a Freehold Township Board meeting and also was deprived of an opportunity to speak when the Board canceled a subsequent meeting. His alleged injuries, at least in part, are directly traceable to the Freehold Defendants, who allegedly conspired to violate his First Amendment right to engage in political and symbolic speech. Because the District Court dismissed his complaint for lack of standing, and this was the only basis for its order, we reverse and remand for further proceedings consistent with this opinion.

Murray-Nolan contends she was arrested for exercising her right to engage in a maskless, symbolic protest at a Cranford Township Board meeting. Though she had standing to sue the Cranford and BOE Defendants, her First Amendment retaliation claim cannot survive their motions to dismiss. Amid valid government-mandated health and safety measures, refusing to wear a face mask is not expressive conduct protected by the First Amendment. Murray-Nolan's retaliation claim also fails because the police had probable cause to arrest her, and she does not link her constitutionally protected speech activities (*e.g.*, her social media posts) to any

of the Cranford Defendants' allegedly retaliatory actions. We thus affirm the District Court's dismissal of her amended complaint.